IN THE

## SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW-YORK,

IN MAY TERM, 1831, IN THE FIFTY-FIFTH YEAR OF OUR INDEPENDENCE.

---

### VAN RENSSELAER'S HEIRS vs. PENNIMAN.

The acceptance by a tenant of a *new lease* of the *same premises*, during the term of the first lease, is deemed a virtual *surrender* of the first lease. Such presumption arises from the acts of the parties, which are supposed to indicate an intention to that effect; but when such intention cannot be presumed, without doing violence to common sense, the presumption will not be supported.

Where, in a lease executed by both parties, is contained a covenant that on the lessee's being removed from the demised premises, or dispossessed, he shall be paid the value of the buildings and improvements made by him, and that on such payment he shall yield up the possession of the demised premises, *an agreement* by the lessor will be *implied*, that the lessee may retain possession until such payment be made, notwithstanding that the term for which the premises were demised has expired.

THIS cause was submitted to the court, on a *case* made by consent, on written arguments. John Van Rensselaer, an ancestor of the plaintiffs, being seized as *tenant in fee-tail* of a certain estate at *Greenbush*, opposite Albany, on the 26th April, 1766, executed a lease to Henry Cuyler, of *seventeen acres* of land, part of the said estate, for *three lives*, to wit, the lives of the lessee, of John I. Van Rensselaer, the grandson of the lessor, and one Robert Van Rensselaer, reserving an

annual rent of $30. In the lease was contained a covenant, on the part of the lessor, in these words : " That if the *heir at law,* or any other person having lawful authority, *choose to expel, remove,* or *dispossess,* the said Henry Cuyler, his heirs, executors, administrators, or assigns, from the said ground, or any part thereof, he is to pay the said Henry Cuyler, his heirs, executors, administrators, or assigns, for the buildings and improvements that may be made on the said land by the said Henry Cuyler, his heirs, executors, administrators, or assigns, as they shall be valued at by two indifferent persons, one to be chosen by the heirs, executors, administrators, or assigns, of the said Henry Cuyler, and the other by the lessor's heirs, executors, or administrators ; and if he or they neglect or refuse to pay what the improvements, shall so be valued at, (*the said Henry Cuyler being evicted,*) that then the said John Van Renssselaer binds his executors and administrators to pay the same." The lessor also executed a *bond* to the lessee, of the same date with the lease, in the penal sum of £3000, *conditioned* that the lessor, his *heirs,* executors, and administrators, should well and truly observe, perform, fulfil, and keep all and singular the covenants and agreements contained in the lease, which, on the part and behalf of the lessor, his *heirs,* executors and administrators, ought to be observed, performed, fulfilled, and kept. On the 29th July, 1782, John Van Rensselaer, the lessor, made and published a codicil to his last will and testament, whereby, after reciting that at the making of his said last will, be held and enjoyed his estate at Greenbush as a *tenant in tail,* and that such *tenure* had been abolished by an act of the legislature of this state, he devised all his said estate to his grandson, John I. Van Rensselaer, during his natural life, and after his decease, to the heirs of his grandson, in fee. In 1783, John Van Rensselaer died, and his grandson, John I. Van Rensselaer, by virtue of the devise contained in the codicil took the estate at Greenbush, including the demised premises, subject to the lease ; and on the 27th June, 1796, executed a lease to Cuyler of the *same premises,* for the *same lives,* and at the *same rent,* contained in the lease of his grand father, and therein *covenanted,* in these words : " That if, after the

expiration or termination of the aforesaid three lives, his heirs or assigns, or any other person or persons having lawful authority, *should choose to remove or dispossess* the said Henry Cuyler, his heirs, executors, administrators or assigns, from the said ground or any part thereof, he or they are to pay the said Henry Cuyler, his heirs, executors, administrators or assigns, for all the buildings and improvements *that may be made* on the said lands by the said Henry Cuyler, his heirs, executors, administrators or assigns, as they shall be valued at by two indifferent persons, one to be chosen by the heirs, executors, administrators, or assigns, of the said Henry Cuyler, and the other by the lessor's heirs, executors, administrators or assigns; and on the payment of what the buildings and improvements shall so be valued at, he, the said Henry Cuyler, his heirs, executors, administrators, or assigns, shall yield up the possession thereof." This lease was executed by John I. Van Rensselaer and his *wife*, as lessors, Mrs. V. R. *joining* in the covenant with her husband; it was also executed by Cuyler. Prior to the execution of the last lease, Cuyler had built a valuable brick house on the premises, which still remains on the same, and erected stables, fences, &c., which improvements constitute the most important and valuable improvements on the premises. In 1803, Cuyler died in possession; in 1822, the demised premises were sold under a decree in chancery, probably in a suit of partition between the heirs of Cuyler, and a deed executed to a trustee of the heirs, who, in 1826, conveyed the premises to the defendant in this cause for the sum of $2500. In September, 1828, the last life specified in the leases expired by the decease of John I. Van Rensselaer. From the execution of the lease in 1766, down to the commencement of the suit, the demised premises were in the *actual* and *uninterrupted* possession of Henry Cuyler, and those claiming title under and through him; the *annual rent* of $30 was duly paid; and the lease of 1766, and the bond of John Van Rensselaer of the same date, remained in the possession of Henry Cuyler, passed to his representatives, and from them to the defendant in this cause. In October, 1828, the plaintiffs in this cause, the children and heirs at law of John I. Van Rens-

NEW-YORK, May, 1831.

Van Rensselaer's heirs
v.
Penniman.

selaer gave a written notice to the defendant, that the *lives* mentioned in the lease from *John I. Van Rensselaer* to Henry Cuyler had expired, and warned him to desist from further expenditures, and from erecting any new buildings upon the demised premises, as they meant to assert their right to the possession thereof. On the 7th January, 1830, the plaintiffs gave a further notice to the defendant that they had appointed a suitable person, in their behalf, to appraise the improvements made upon the demised premises, *under the lease of the 27th June*, 1796, and requested him to appoint an appraiser on his part, and to give them notice thereof. Two days thereafter, the defendant gave notice to the plaintiffs that he had chosen J. B. Esq. as a suitable and indifferent person, to value the buildings and improvements made on the demised premises by Henry Cuyler, his heirs and assigns, to be paid by the plaintiffs, in virtue of the provisions and covenants contained in the *several leases* from *John Van Rensselaer*, deceased, and *John I. Van Rensselaer*, deceased, to the late Henry Cuyler, deceased, for the said premises, referring particularly to the leases. In May, 1830, the plaintiffs informed the defendant that they had appointed an appraiser, *under the lease executed by John I. Van Rensselaer*, who would be instructed to appraise the improvements made *after* the execution of that lease, and to disregard those made *previously;* and requested the defendant to appoint an appraiser on his part, to meet the appraiser appointed by them. The defendant answered that he had appointed an appraiser *under the two leases*, and that he did not intend to join in any appraisement of the improvements made under the latter lease alone. Whereupon the plaintiffs commenced an action of ejectment for the recovery of the demised premises, without any appraisement having been had of the value of the improvements, or any compensation made therefor. John I. Van Rensselaer acquired from his grand-father, by descent or devise, real estate exceeding in value over and above the debts of his grand-father, the improvements made on the demised premises; and the plaintiffs have derived from John I. Van Rensselaer, by descent or devise, real estate, over and above his debts, more than sufficient to pay for all the im-

provements made on the premises in question since the execution of the lease of 1766. The average yearly value or rent of the premises since the date of the first lease, has been 27 dollars.

*J. Blunt,* for plaintiffs. The acceptance of the *second lease* was a surrender of the *first lease,* and deprived the lessee, and those claiming under him, of the right to claim payment for the improvements made under the *first* lease; and under the *second* lease, the defendant having succeeded to the rights of the lessee, is entitled to compensation only for improvements made subsequent to its date. The acceptance of the second lease was a surrender of the first. *Bacon's Ab. tit. Leases and terms for years, sec. 3. Jacob's Law Dict. tit. Surrender.* 4 *Leon.* 83. *Cro. Eliz.* 605. 12 *Johns. R.* 357. Both leases cannot be considered in force; if they are, the rent reserved by each must be paid, which will not be conceded by the defendant. It was not intended by the first lease that the improvements should be paid for at the end of the term; payment was to be made only in case of *eviction;* and if no eviction, the improvements of course went to the *heir.* By the lease of 1796, provision was made for the payment of improvements *thereafter* to be made, but no authority is given to retain possession, until payment. The covenant, that the lessee and his assigns will yield up the possession of the premises on such payment being made, does not confer the right to retain possession, until payment; possession could be retained only during the term granted, and cannot rest on inference. The first lease being surrendered, the defendant cannot claim for improvements made previous to the date of the second lease, in 1796: and, although entitled to compensation for improvements made since that time, his term being expired, he cannot retain the possession, there being no express grant authorizing such possession.

*H. Bleecker, B. F. Butler & S. M. Hopkins,* for defendant. By the lease of 1796, the right of retaining possession is granted to the lessee and his assigns until the payment of the appraised value of the buildings, and improve-

ments made on the land. The fact, of the parties disagree-
ing as to the subject matter of the appraisement, did not au-
thorize the commencement of the suit. The plaintiffs should
have compelled an appraisement by a bill in equity ; and, at
all events, notice to quit should have been given, the defen-
dant having paid rent since the expiration of the last life spe-
cified in the lease, might claim to be treated as a tenant from
year to year.

The defendant may retain possession until paid for the im-
provements made, as well *before* as *after* the second lease.
John Van Rensselaer, the first lessor, was *tenant in tail ;* by
the act of 1782, *abolishing entails,* he became tenant in fee
simple. This act was re-enacted in 1786, 1 *R. L.* 52, and
both acts have been adjudged to be as well *prospective* as *re-
trospective.* 12 *Johns. R.* 169. By the operation of those
acts the lease of 1766 was confirmed, the tenant having
been in the uninterrupted possession of the demised premi-
ses. The covenants in both leases run with the land, bind-
ing those who acquire the reversion, whether by descent or
devise. The second lease was probably executed to remove
doubts existing as to the rights of the lessee, in consequence
of the lessor in the first lease, being at its date only *tenant in
tail.* The payment for improvements, provided for in the
lease of 1766, was to be made at all events, and not *only* in
case of *eviction.* The rent reserved exceeded the annual
value of the land ; and it cannot be supposed, that in addi-
tion thereto, it was understood between the parties that the
tenant was to yield up without compensation, improvements
worth thousands of dollars ; the *bond* of 1776 rebuts such
conclusion. The intention of the parties undoubtedly was,
that *whenever* the tenant was dispossessed, he should be paid
for his improvements. By the terms of the lease, if the ten-
ant was dispossessed *before* the expiration of his term, he was
to be paid for the improvements ; why should he not be paid
at the expiration of the lease ?

The acceptance of the second lease was not a *surrender* of
the first lease. A surrender in law can be produced in only
one of two ways, either by the technical consequence of
*merger* by the union of estates, or by implication or construc-

tion founded on *the intention of the parties,* as evinced by their acts. *Roberts on Frauds,* 254, 257. There is no *merger* here, because the second lease is not executed by the reversioner *alone,* but by *him and his wife;* not only the grant, but the covenant running in their joint names. It is well settled, that if the lessee grant to the reversioner and *any other person,* it is no surrender. *Perkins,* § 618, *to* 623. A release to the lessor *and his wife* could not produce a merger of estates, the *reversion* being vested in the husband alone. 4 *Kent's Com.* 97, *to* 101. A *surrender by implication* must be in conformity with the intention of the parties ; the intention here manifestly was to establish and confirm, and not to diminish or impair the rights of the lessor. When the second lease was executed, the house had been built, and the most important improvements had been made, and if the interest of the lessee had been defeated, he was entitled to compensation. Upon what principle can it be presumed that he relinquished that right ? Security against eviction could not have been the inducement, for he could not be evicted till the termination of his lease. The fair presumption is, as before suggested, that the second lease was executed under an erroneous impression as to the right of the original lessor to demise for a period beyond his life, and to confirm what was supposed to be a defeasible interest ; which presumption is supported by the fact, that the original lease and bond were retained by the lessee. A surrender will not be implied, when it is obvious that the second lease was intended to be *beneficial,* and that the lessee was not to lose any rights he possessed. *Cro. Jac.* 176. *Cowp.* 600. 6 *East,* 104. Where a lease is accepted from a reversioner for a less interest than the tenant held, the taking of a second lease is deemed a surrender of the first, because of the *merger* in the reverionary estate of the interest created by the first lease, and not conveyed by the second ; but, when the second lease conveys the same interest, what right is merged ? and if there is no merger, there is no surrender. The object of the parties was a confirmation of the original lease, and to render more secure the rights of the lessee ; a confirmation is a conveyance of an estate or right *in esse,* whereby a voidable estate is

made sure and unavoidable, and the words of the grant are sufficient to operate as a confirmation. (*Co. Litt.* 295, *b,* 302, *a.* *id.* 297, *a.* 1.) If two leases can stand together, the last shall not be construed to defeat the first, by implying a surrender. (*Bacon's Abr. tit. Leases, S. Surrenders in Law. Roberts on Frauds,* 259.) The second lease provides virtually for a continuance of possession, until the improvements should be paid for ; this is cumulative to the provisions in the first lease, but by no means contradictory ; the provisions may well stand together. The payment of the rent on one lease might be pleaded in bar to an action on the other. *Cro. Jac.* 176.

To ascertain the extent of the defendant's claim to payment for improvements, both leases must be looked to. The bond originally executed was left in the hands of the lessee, and although in the second lease payment is provided only for buildings and improvements *that may be made,* the two leases must be considered *in pari materia,* and as explaining each other. The first lease covered all improvements to be made during the term ; and as the principal improvements were made before the execution of the second lease, it must be presumed that the covenant was made in reference to them. A grammatical sense, in the construction of covenants, is not to be adhered to, when a contrary intent is apparent ; 8 *Johns. R.* 495.; 3 *id.* 388 ; 1 *Johns. C.* 11. 11 *Vesey, jun.* 148 ; *Branch's Principia,* 9, 152, 134 ; 7. *Co.* 27 ; 8 *id.* 94 ; but it is even doubtful whether the grammatical sense is opposed to the construction of the defendant, which must prevail, or the intention of the parties will be defeated, and manifest injustice done. In ascertaining the intention of parties, their conduct, motives, and the state of facts, will be looked into. 1 *Wendell,* 548.

*P. A. Jay,* in reply. The first lease was surrendered, and consequently the covenants in it were annulled ; but, allowing it to be in force, it gives not even the colour of title to hold over after the expiration of the term demised. The covenant in that lease is to pay, *if the lessee is evicted;* when evicted, the representatives of the lessor are to pay ; but no

permission is granted that the lessor shall *hold over* until the NEW-YORK, May, 1831.
improvements are paid for. His remedy, if any, is by action
on his covenant. Nor does the second lease authorize a Van Rensse-
holding over ; the demise is for three lives, and when the laer's heirs
term expired, the estate of the lessee ceased. The cove- v.
Penniman.
nant in that lease is to pay for the improvements, if the re-
versioner chooses to dispossess the tenant ; and until he does
dispossess him, there is no obligation to pay. The covenant,
on the part of the lessee, to yield up the possession of the
buildings and improvements, on being paid their appraised
value, gives no right to retain possession until payment ; it
is the covenant of the lessee, and not of the lessor. Even a
covenant by the lessor that the right of dispossessing the ten-
ant should not be exercised, could not have been pleaded in
bar to an action of ejectment ; the tenant would have been
driven to his action on the covenant. Besides, having refus-
ed to appoint an appraiser, on his part, when required so to
do, nothing can be claimed under it by the tenant. Notice
to quit was not necessary, it not appearing that any rent was
paid after the expiration of the term.

It is not denied that a surrender by implication arises from
the supposed intention of the parties ; but it is insisted that
such intention cannot be proved by *parol*, the leases them-
selves being conclusive evidence of the intent. The first
lease was confirmed by the acts of the legislature abolishing
entails, and was, at the time of the execution of the second
lease, a *valid* lease ; the second lease, therefore, shews an
intention of a new contract, different from the former ; other-
wise it would have been useless. If resort be had to parol
proof, the same result follows. A rent of only $30 per an-
num was paid, although, if both leases were in force, the ten-
ant was bound to pay $30 rent per annum on each ; and if
both leases were in force, the reversioner is bound to pay
twice for the improvements. Besides, if the first lease con-
tinued in farce, the second was absolutely void : for the les-
sor granted that in which he had no estate. The second
lease, although executed by the reversioner *and his wife*, must
be considered as the act of the reversioner *alone*, as the *unac-*

*knowledged* deed of a *feme covert* is absolutely void. 8 *Cowen*, 279. The first lease was extinguished by the acceptance of the second, and there is nothing in the second which authorizes the holding over. The estate granted is expired, and the lessee's own covenant to yield up possession upon certain stipulations being complied with, does not authorize him to hold possession. What are those stipulations ? That the reversioner shall pay for all the buildings and improvements that *may be made* on the lands, &c. If the words *may be made,* are ambiguous, as insisted on the other side, and may mean improvements made *before* as well as *after* the second lease, then the ambiguity being *patent,* cannot be removed by parol testimony ; it is, however, insisted that the proposition is *too* plain to require illustration that the covenant applies only to prospective improvements. If the motive of the tenant in accepting a new lease is sought after, it probably was, that, as the lessor was by the first lease bound to pay for improvements *only in case of the eviction* of the tenant, the latter was desirous to secure payment for *future* improvements, *at all events ;* but the motives of the parties should be gathered from the instruments themselves, and not from extraneous circumstances.

*By the Court,* Savage, Ch. J. The first and principal question in this case is whether the acceptance of the second lease was a surrender of the first.

It seems to be well settled, that if a lessee accepts a new lease of the same premises during the term in the first lease, the first is deemed to be virtually surrendered. The cases are collected and commented on in *Roberts on Frauds,* 254, *and onwards.* The reason is, that the acceptance of the new lease admits the capacity of the lessor to make such new lease, which he could not have, without a surrender of the first lease. This effect, it is said, may be produced in two ways : 1. by implication or construction, 2. by merger. The doctrine of merger can have no application to this case. It must be by construction, if at all, that a surrender is to be presumed in this case. " The implication of intention from the acts of the parties, is the only legal foundation which will

support them, (surrenders,) in all their extent ;" *Roberts on*
*Frauds,* 257 ; that is, because the lessor cannot legally ex-
ecute a second lease of the same premises during the time of
a first lease. When the lessee takes a second lease unex-
plained, this act admits the power of the lessor, which he
cannot legally have without a surrender of the first. The
presumption of law therefore is, that a surrender has been
made. It has been well remarked, that the doctrine of pre-
sumption is founded upon the known disposition of man to
enjoy what is his own. No man would take from another a
lease of his own farm or house, and agree to pay rent for it.
This presumption is raised by the circumstances of the case,
and the acts of the parties ; and the cases cited in the argu-
ment, and also by *Roberts,* shew that the acceptance of a se-
cond lease, even for a shorter time than the first, implies a
surrender of the first ; and this is the consequence, although
the second should be void for any cause other than the want
of authority in the lessor. As this presumption of a surren-
der arises from the acts of the parties, which are supposed
to indicate an intention to that effect, it must follow that
where no such intention can be presumed, without doing vi-
olence to common sense, the presumption cannot be sup-
ported. The cases seem to have settled the point, that sim-
ply receiving a second lease raises that presumption. The
giving a second lease to a third person does no prejudice to
the first lessee ; the lessor has in fact no power ; and so long
as the lessee in the first lease does no act recognizing such
power, the second lease is of no force. The acts of the lessor,
therefore, receive force from those of the lessee.

If the acts of the parties in this case, taken all together
are such as to rebut the idea of a surrender, then none ought
to be presumed. The facts in this case are that the lessor,
when he executed the first lease, in 1766, was tenant in tail.
This was before our revolution. From an examination of
the papers then executed, it is fair to presume that the par-
ties intended a sale ; but not being able to accomplish that,
a lease for three lives was given. This the tenant in tail
might lawfully do ; and he selects as one of the *cestui que
vies* the heir at law, so that the heir himself could not take

possession. The lease contains a covenant that the person entitled to enter should pay the lessee for the value of the improvements; and lest he might not have power to bind those who should have the right of entry, the lessor gives a bond, the condition of which is, that the improvements shall be paid for, *if the heir at law chooses to dispossess the lessee.* If he does not choose to dispossess the lessee, then the lessee retains possession, and nothing is paid for improvements. The rent is $30 per annum, which is three dollars per year more than the annual value of the land. This sum, compounded for more than sixty years, would more than equal the value of the land at the date of the lease, or at the present time. It has been contended, on the part of the plaintiff, that by the first lease the improvements were not to be paid for at all, unless the heir entered *before the termination of the three lives.* That proposition is not supported by the fair construction of the lease, and the fact just mentioned rebuts it. To shew such a consequence consistent with justice, it should have appeared that the rent was so far below the true annual value of the land, that the additional annual value would equal the value of the improvements.

The American revolution, and the law of this state consequent upon that event, altered the rights of the lessor. Instead of being tenant in tail, he became, by our statute, tenant in fee; and by his will, he gave the property for life to the same person, who, but for the change in the law, would have been absolute owner. The rights of the lessee were not changed; he was still tenant *per auter vie* for the three lives named. On the 22d June, 1796, the second lease was executed, which purported to be given for the same term, and at the same rent, and contains a similar covenant for the payment for improvements, and a covenant by the lessee, that on being paid for his improvements at the expiration of the lease, he will yield up the possession of the premises. As the lease is signed by both parties, this covenant contains, by implication, an agreement by the lessor that the lessee may retain possession until he shall be paid for his improvements. The question recurs, did this transaction amount to a surrender? A surrender, to be effectual, should be made

to the lessor, or the reversioner. John I. Van Rensselaer was neither. By the codicil to the last will and testament of his grand-father, he had a life estate in the premises, but subject to the lease given by his grand-father. Probably the true object of the second lease was to confirm the prior lease, and to give the lessee greater security for his improvements than he had by the first lease. When the second lease was executed, the lessee had a good title by the first lease to all which it purported to convey. He had, besides, the personal covenant of the lessor for the payment of the improvements. On the supposition that a surrender was intended, the lessee must have intended to abandon all claim for his improvement, and to give up a good title for *three lives*, on receiving a lease for *one* of those lives. John I. Van Rensselaer being tenant for his own life only, supposing a surrender made, could not give a valid lease for three lives. At his death his estate terminated, and his heirs would have had a right to enter, although the other lives mentioned in the lease might have been *in esse*. Under these circumstances, and no surrender having in fact been made of the first lease, or of the bond accompanying it, but both being retained by the lessee, I cannot believe that a surrender was intended. The authorities say that the surrender in cases of second leases is presumed from the intention of the parties. In this case, every circumstance, except the fact of receiving the second lease, altogether rebuts the idea of an intention to surrender the right to compensation for improvements.

If no surrender was intended nor made, then the question arises whether both leases are in force, and whether rent is due on each. The only satisfactory answer which I can give is, that the second lease was intended as a confirmation of the first; and the fact, that only $30 per annum rent has been paid since the execution of the second lease, supports such conclusion. I am of opinion that no surrender was made or implied in receiving the second lease.

Supposing, however, that the acceptance of the second lease should be deemed a surrender of the first, the whole of that instrument as cancelled, and the bond given as a collateral security for the performance of the covenant of the lessor, as in-

NEW-YORK, operative, what improvements are the plaintiffs liable to pay
May, 1831. for, under the stipulation contained in the second lease? The
Van Rensse- covenant is to pay for *all the buildings and improvements that*
laer's heirs *may be made on said lands.* It is not denied that this covenant
v. is obligatory upon the plaintiffs in this suit. The words, *may*
Penniman: *be made on said lands,* I think, may be understood as synoni-
mous with *may have been made,* or *shall then be and remain* on
said lands. It must have been the intention of the parties
that the improvements should be in existence upon the lands
when the lessee should be turned out of possession. The
lessor and his representatives would be very unwilling to pay
for improvements made after 1796, if the buildings had been
consumed by fire; but, according to the strict grammatical
construction of the words, such buildings and improvements
would *have been made,* in the language of the covenant. To
give a rational meaning to the words used in the contract,
requires us to say that they include all such improvements as
are actually upon the premises, when the heirs assert their
right to enter. My conclusions are, 1. That by the first
lease, the defendant is entitled to compensation for all his im-
provements, but is not entitled by virtue of that lease to re-
tain possession until paid for his improvements; 2. That the
second lease, under the circumstances of this case, was not a
surrender of the first, but a confirmation of it; 3. That by
the second lease, whether the first was surrendered or not,
the defendant is entitled to compensation for all the buildings
and improvements upon the premises at the expiration of the
lease, provided the premises are demanded of him; and that
he is entitled to retain possession until he is paid for those
improvements.

The defendant is entitled to judgment.