Bockee, Senator.
We have before us in this case the very able adverse opinions of Chief Justice Nelson, and the late Mr. Justice Cowen. We have also the opinion of Mr. Justice Bronson, couched in terms of great brevity, who “ thinks it cannot be denied that our usury statutes have been greatly shaken by the recent decision of this court in Rapelye v. Anderson, (4 Hill, 472,) and although that case was not like the one before us in its circumstances, it was at least as plain a case of usury as this is;” and on that ground he concurs with the chief justice in giving judgment for the plaintiff. It is pretty evident that the learned judge considers both these cases to be very plain cases of usury, and that if he had followed the convictions of his own enlightened mind, the decision of the supreme court which we are reviewing would have been different. It ought to have been different, according to the declared opinion of a majority of that court. Mr. Justice Bronson considers this a plain case of usury; and yet he decides that it is not usury, because this court in another case, unlike the present, has greatly shaken the statutes of usury. It would be much to be regretted if justice in our high courts is administered upon such principles. The case of Rapelye v. Anderson is referred to, not as authority, but by way of excuse, for the purpose of showing that, as the statutes of usury have been greatly shaken, they may as well be entirely broken down. The chief justice, in the examination *447 of numerous authorities supposed to have a hearing Upon the principal question arising in this cause, has not thought it necessary to bring the case of Rapelye v. Anderson into the discussion. The Circumstances of that case, and the principles upon which it Was decided, are so foreign to the' questions which arise in this cause, that the able counsel for the defendant in error has not referred to it as sustaining the validity of the notes upon which the present action is brought. Has Mr. Justice Bronson gone out of his way to throw another missile against the decisions of this court? The case of Rapelye v. Anderson does not admit of discussion herei It is an authority which is 'binding upon all subordinate courts, so far as the principle upon which it was decided can have a proper application, but it has no pertinency in the present case, and cannot furnish the shadow of an excuse fbr sacrificing the legal rights of either of the parties in this controversy. If this court has decided wrong, it furnishes no precedent for error in other and different cases, where the principle of analogy cannot be applied. The Constitution provides that the justices of the supreme court on the trial of writs of error, shall give the reasons of their judgment, but it is no where written that they shall make their judicial opinions, given Under the requirement of the constitution, the vehicles of censorious Criticism upon the decisions of this court. These remarks are made in the humble hope of discountenancing a practice rather indecorous, and, as it may affect the rights of parties litigant, certainly leading to no beneficial results.
Leaving this digression and proceeding to the consideration of the merits of this cause, the first question which meets us is, as to the sufficiency of the evidence of notice given to the endorser. I entertain no doubt that this question was correctly decided by the referee, and by the supreme court without any dissent.
It was also, I apprehend, rightly considered, both on the trial and by all the justices of the supreme court, that the notes upon which this süit is brought, having been discounted by the plaintiff for the purpose of taking tip the notes discounted at the bank, do take the hue and color of the original transaction j and *448 if those first notes discounted at the bank on which the premium for endorsement was paid were usurious in the hands oí the plaintiff, then he cannot recover.
It is a prominent fact appearing in this case, and not denied on the argument, that these notes were drawn for the purpose of raising money by being discounted at the bank. The whole previous arrangement of drawing and indorsing was inchoate, preliminary and instrumental in effecting the main purpose which the parties desired to accomplish, that is, a loan of money. They made a proposition to the bank to exchange these notes made for that special purpose, for an equivalent in money, less the legal discount. The notes did not pass into vitality until discounted by the bank, and in its hands they are doubtless valid securities.
A very different question arises between these parties; one of great intricacy and perhaps doubt, and on which I apprehend -there may be a diversity of opinion in this court, as there was in the-court below. I conceive the question to be, whether the mere selling or loan of an endorsement of accommodation paper made for the purpose of raising money, and the exacting of a premium greater than the legal interest, is a transaction which the court is authorized to pronounce usurious on its face? The conclusion of Judge Gridley, who was the sole referee in this cause, 11 that the first transaction was the mere selling of endorsements, or, in other words, the giving of a conditional guaranty of the payment of the notes for which the plaintiff received a stipulated compensation, and that there was no loan of money or choses in action within the statute of usury,” is not the certificate of a fact, but is manifestly the decision of the principal question of law arising in the cause, which we have the right, and which it is our duty to review.
Can this be considered a contract of guaranty? There must be two or more parties to every contract. When Muir, by his agent Burr, applied to Ketchum &. Co. to buy their endorsement on notes to be afterward negotiated, he surely did not design to pay them $90 for a guaranty to himself that he, Muir, should pay his own notes at maturity. Such a contract would be per *449 fectly absurd. A contract of guaranty is not in its nature assignable, and could not enure to the benefit of any future holder of the notes. It is true that a guaranty may be given in the form of an endorsement, as in Oakley v. Boorman, (21 Wend. 588.) In that case, there was a valid existing security upon which the contract of guaranty could have ‘ effect. There was the holder of the note with whom such contract could be properly made. There was the contract of guaranty or insurance of the solvency of the maker of the note, unconnected with any advance of money or anticipated loan. Such contract does not come within the letter or spirit of the statute of usury. In such a case no advantage is or can be taken of the necessities of a borrower; and the parties may well be permitted to agree upon any amount of premium as a compensation for the risk and hazard which the guarantor takes upon himself.
In Oakley v. Boorman, Mr. Justice Cowen, who delivered the opinion of the court, remarked, “ that there is no distinction in principle between an endorsement for future advances, and an endorsement to secure a precedent debt.” The remark is doubtless true in the sense in which it was meant to be understood, that there is no difference as it regards the liability of the endorser to the holder of the note. But the same learned and lamented judge, in the very case we are now considering, has found a very wide difference between an endorsement to secure a precedent debt, and an enddrsement for future advances. The former he considers a valid contract, whatever premium is paid for endorsement. The latter he considers a palpable case of usury, when the premium paid exceeds the legal interest. Chief Justice Nelson, for the purpose of making the case of Oakley v. Boorman carry weight as an authority in favor of the defendant in error, has shewn that in both cases the remedy of the endorser or guarantor against the maker would be the same. This may be so,- but I have entirely failed in my object if it is not sufficiently shewn that there is a distinction between the cases; that the one may be a guaranty in the form of an enddrsement, and that the other cannot in any legal sense be considered as a guaranty. I conclude that the present is simply *450 the sale or loan of an endorsement. It is a loan of credit, byway of endorsement, for the purpose of giving facilities to the borrower, and is unconnected with any legal charge for commissions, brokerage or services. It is the loan of something, and I can call it nothing but “ a thing in action,” available to the uses of Muir iri effecting a loan of money.
The argument which was used in behalf of the defendant in error, that the premium paid might be a proper and legal compensation for the inconvenience and trouble of raising money at a future day, is utterly untenable. I know as well as any one the trouble and inconvenience of raising money; but the law has settled this matter, and fixed the compensation at a rate which shall not be exceeded. The person who loans money might with as much propriety charge an extra compensation for the trouble and inconvenience of counting it.
It was also made a point on the argument in behalf of the defendant in error, that, if the notes in question were made to raise money upon for the use of the maker, neither the defendant in error nor his partners had any knowledge of the fact, and therefore it is .inferred that it was not usurious to receive a compensation for guaranteeing the payment of said notes. It is true, the evidence does not shew, that the plaintiff below had any knowledge of the purpose for which the notes were made. He may be acquitted of any intention to violate the statute of usury, having done no more than Judge Grid ley and Chief Justice Nelson say he had a legal right to do. Yet I conceive that this want of knowledge of the real facts of the case can make no difference. The holder of usurious paper cannot recover, however innocent he may be. It is not a case in which the law requires notice, but holds the party accountable for his acts, at least in a civil action, with or without knowledge. If the original concoction of thesé notes, coupled with the premium endorsement, make out a Case-which the law adjudges to be usury, the alleged want of knowledge cannot alter the nature of the transaction or l-ender it valid. It is not material whether the party thought he was guilty of usury, if the act or thing is done which the law deems to be usury.
*451 What test shall we apply to determine the question of usury ? I think the following a very fair and.proper test, and in strict harmony with all the adjudged cases on the subject of usury. Where the borrower of money or of any property or thing in action, in every contingency, pays more than the legal interest, and the lender of the money or any property or thing in action, at the same time, directly or indirectly reserves and secures to himself a return of his principal, with more than legal interest, exclusive of any legal charge for commissions or services, the transaction must be adjudged usurious, whatever may be its form. If such result is apparent on the face of the transaction, or on the facts appearing to the court, they will decide it to be usury, and it would be needless and improper to refer it to a jury to determine the quo animo or intent of the parties. In other cases, where such result is not apparent, the subject is necessarily referable to a jury to ascertain whether it is a fair business transaction, or a shift and device to cover an usurious loan.
How do the parties in this ease stand affected by the rule which I have stated? Muir is the borrower, raising money on the discount of his note, and paying legal interest to the bank, and a still greater amount by way of premium to the endorser by whose credit the loan is effected. He at all events pays something like double interest on the amount of the loan. The endorser has secured his premium, being more than the legal interest for the time the note has to run, and if it is paid he has the amount of his premium for the mere loan of his endorsement, without any advance of money; and if he pays the note, he recovers it with legal interest of the maker, and has his premium as an excess above the legal interest.
The case of Cram v. Hendricks, (6 Wend. 569,) decided in the supreme court, and affirmed in this court, was the sale of a valid negotiable note, by the payee endorsing it and paying one per cent, per month for the time it had to run. The purchaser and holder of the note in that case escaped being caught in the net of usury, by the court holding that, in an action against the endorser, he should recover, not the nominal amount of the note, but the actual sum which he had paid for it. It would seem to *452 be Very strongly implied from this case of Cram v. Hendricks that even on the sale of a valid business note, if the purchaser does in every event secure to himself a return of-his principal, with more than legal interest, the transaction is usurious.
On an exchange of notes for the purpose of giving a borrower credit and facility in negotiating*a loan, and a reservation of more than legal interest, the transaction has been repeatedly adjudged to be usurious'on its face. How does the present case differ, except that it effects the same object by indirect means ? In both cases there is a loan of credit—r-the loan of a thing in action from which money is to be realized, Instead of a present advance of money, there is an engagement and liability to pay money at a future day, and the receipt of a premium over and above the legal interest to which the party is entitled. It appears to me impossible to draw a line of distinction between these cases. The loan of an endorsement is equivalent to and undistinguishable from the loan of a note, and leads to precisely the same result. The loan of credit, either in the form of an endorsement or a promissory note,. is as much within the mischief which the statute of usury was designed to correct, as the direct loaning of money at usurious rates. To my apprehension it would be more injurious and alarming. Inasmuch as credit has qualities more expansive than cash, so would the practice of loaning money at high and oppressive rates of interest be systematized, extended and enlarged.
I have not adverted to the fact that Mr. Ketchum was a director of the bank at which one of these notes was discounted by means of his purchased endorsement, because that can make no difference in the lawfulness of the transaction. But it is a circumstance which is calculated to make us open our eyes pretty widely to the mischiefs and oppressions which might en-. sue in case the statute against usury is made a dead letter by sanctioning such endorsements. Allow them to be vended or loaned, either by bank directors or others, on any terms to which the necessities of one party and the cupidity of the other will assent, and all the fences and barriers which the statute has raised against usury are completely overthrown, and a wide gate *453 is opened to the practice of usury; a way as broad as that which leadeth to destruction, and many are those who will enter therein.
I think the judgment of the supreme court ought to be reversed.
Senator Clark was in favor of reversing the judgment of the supreme court, for the reasons assigned in the dissenting opinion of Mr. Justice Cowen. (See 4 Hill, 236 et seq.)
Johnson, Senator.
The two notes, upon which the action was brought, were regularly discounted by Morris Ketchum, the defendant in error, and unless they were renewals of the two prior notes, or connected therewith, the question of usury does not arise. Of the first set of notes, the one for $1000 was endorsed by Barber <fc Leonard, the plaintiffs in error, and the other, for $2000, was endorsed by Barber alone, and the firm of Suydam & Kevan of New-York. One of these two prior notes was discounted at the Union Bank, and the other at a bank of which the name is not stated. It appears, therefore, that with the first $2000 note Leonard had no connection. The referee reports that, at the time Ketchum discounted the second and last set of notes, to recover the amount of which this action is brought, no express notice to the defendant in error was given 11 that the .money was wanted to take up the former notes,” and that the discount was made “ without any agreement on the part of Muir or Burr that the proceeds should be so applied, and that there was no condition to that effect annexed to the discount.” If Muir, the maker of the two last notes, had applied the proceeds (which he had a perfect legal and moral right to do) to the payment of debts not connected with the former notes, or in the purchase of property, there would not be the least pretence that the taint of usury attached to them. Can the mere voluntary act of Muir, or of his agent Burr, in applying the avails of these notes in payment of the notes endorsed by Ketchum, Rogers & Bement, change the character of the transaction ? That Ketchum had good reason to believe and did believe that the money would be applied to pay off the former notes endorsed by *454 his firm, can make no difference, as this belief could not change the obligation of Muir or Burr. Nothing short of a notice to the defendant in error, or a condition of the discount by Ketchum that the. money should be so applied, is sufficient, it seems to me, to raise the question of usury, in the notes on which the action is brought. The discount of the two last notes was an independent transaction, and had no necessary and binding connection with the former notes. I am therefore of opinion that the judgment of the supreme court should be affirmed.
Had the question of usury, however, arisen on the two first notes, I should have no doubt that the loaning by Ketchum, of the names of Ketchum, Rogers & Bement, at the rate" of two and a half or three per cent, for the time the notes had to run, would have fallen within the provisions of the statute against usury. (1 R. S. 771, 2, §§ 1, 2, 5.) It cannot vary the principle involved, that the transaction is characterized in the referee’s report as the buying of an endorsement or guaranty. The first section of the statute above cited provides “ that the rate of interest upon the loan or forbearance of any money, goods, or things in action, shall continue to be seven dollars upon one hundred dollars for one year ” &c.; and by the second section it is provided “ that no person or corporation shall, directly or indirectly, take or receive in money, goods, or things in action, or in any other way, any greater sum, or greater value for the loan ” <fec. than is above prescribed. To understand clearly the meaning of these two sections, as applicable to this case, let it be asked what did. Ketchum loan? Most certainly, the endorsement of his firm, upon which an action could have been brought by the holder of the notes, after maturity. It would be very nice reasoning to say that the use of the names of Ketchum, Rogers & Bement, at the rate of two and a half or three per cent, for four months, was not the loan of a thing in action. Again, what did Ketchum receive for the loan of the endorsement ? Besides the two and a half or three per cent., amounting to seventy-five or ninety dollars, he received conditionally the notes, which he knew to be perfectly good, provided he should have to pay them when due. Viewed in *455 this light, which is according to the real nature of the transaction, there can be no doubt that it falls under one of the most aggravated forms of usury, within both the letter and spirit of the statute. But as my opinion is in favor of an affirmance of the judgment for the reasons before assigned, it is unnecessary to pursue the subject further."
Lawrence, Senator.
The revised statutes provide that “ the rate of interest upon the loan or forbearance of any money, goods or things in action, shall continue to be seven dollars upon one hundred dollars for one year, and after that rate for a greater or less sum, or for a longer or shorter time. (1 R. S. 771, § 1.) The second section prohibits the .talcing, either directly or indirectly, any more than the legal rate of interest; and the fifth section declares all contracts for a greater rate of interest void.
Apply the statute to the transaction before us, and no one can doubt that it is a. clear case of usury. This was not a loan or forbearance of money, nor was it a loan or forbearance of goods; but can we say that it was not a loan of a “ thing in action ” ? If we say that it was not, we must say that Ketchum’s signature created no obligation on his part to pay the note. This will not be pretended. These Wall-street brokers did not so understand it. They supposed they were getting a thing in action, something upon which they could predicate a claim or a suit, when they obtained Ketchum’s signature as endorser. It was immaterial to them whether Ketchum signed the note as principal or surety. He was the one they regarded as the responsible man. The other signers might have been men of straw; mere John Does or Richard Roes. The bank which discounted the note probably did not look beyond the name of Ketchum, in whom they had entire confidence, and against whom they supposed they had a right of action by virtue of this endorsement.
The case then stands precisely as it would have done had Ketchum given his own note for the money borrowed, and kept the original notes in his hands, and received the premium specified. Would it be said that this note would not be a “ thing in action ”? The signature in either case creates an obligation to *456 pay, or a “ thing in actionand this is precisely what is prohibited from being loaned or discounted at a rate above seven per cent. »
It is perfectly clear then that the case thus far presents a strong case of usury, and if the two notes discounted last were merely a continuation of the same transaction, they cannot escape the taint of usury which so plainly exists. It appears from the report of the referee that the plaintiff’s firm, when they discounted these notes, believed and had good reason to believe that the money would be applied to take up the former notes. The referee also reports that the proceeds of the notes discounted by the firm were applied by Burr to take up the former ones; that it was Muir’s intention so to apply the avails, and that he procured the notes for that express purpose. No one can doubt that this was well understood by all parties at the time of discounting the notes. The whole made but one transaction, the second notes taking the place of the first, and partaking of course of their usurious character.
Believing this to be a case coming clearly within the statute against usury, I must Vote for reversing the judgment of the supreme court.
Senator Lott delivered ati oral opinion in favor of affirming the judgment of the supreme court, concurring in the view presented of the question of Usury by Chief Justice Nelson. (4 Hill, 227 et seq.) In addition to the cases cited by the chief justice, the senator referred to Beckwith v. The Windsor Manufacturing Company, (14 Conn. Rep. 594,) as containing a correct exposition of the law on this subject.
Rhoades, Senator.
Two important questions are to be considered, upon the determination of which must depend the decision of this court in the case before us, viz. 1st. Whether the two notes made by Muir and endorsed by Barber and Léonard, on which Burr the agent of Muir procured the endorsement of Ketchum, Rogers & Bement, were usurious in their' inception, or in any subsequent period of their existence; and 2d. If so, *457 whether there was such a connection between those notes and the notes on which this suit is brought as to affect the latter. It is admitted that the notes were made for the purpose of raising money, and had they been discounted in the form in which they first came into the hands of Burr, the agent of Muir, and without the endorsement of Ketchum & Co., their validity would not have been questioned.
If the first two notes were usurious, they became so by the endorsement or guaranty of Ketchum, Rogers & Bement, at a premium of three per cent, on their face, paid by Burr, as the agent of Muir, for the purpose of getting them discounted at some of the banks of the city of New-York. Of the manner iff which that endorsement was obtained, the banks at which the notes were discounted do,not appear to have had any knowledge.
Our statute against usury, after fixing the raté óf interest at seven per cent., provides that “ no person or corporation shall, directly or indirectly, receive in money, goods, or things in action, or in any other way, a greater sum or greater value for the loan or forbearance of any money, goods or things in action, than is above prescribed,’ (1 R. S. 772, § 2,) being seven per cent. The notes of Muir, after' having been endorsed by Ketchum & Co., if they had any character which would bring them within the meaning of the statute, must have been things in action. They were clearly neither money nor goods. Á note may be a thing in action, but in order to make it such it must have a legal existence. After these notes had been endorsed by Ketchum & Co., they were not then perfect instruments, but were yet inchoate. No suit at law or equity could have been maintained for their collection, either in the hands of Muir or any other person, for they had not been negotiated, and therefore had no vitality. They could not be considered as assets in the hands of the assignees or administrators of Muir’s estate, but were as valueless in the eye of the law as if they had been so much blank paper. In order to constitute a chose or thing in action “ there must be a power or right to sue for the same;” but while these notes endorsed by Ketchum & Co. *458 were in the hands of Muir, Ketchum & Co. could not have brought an action to recover them from Muir’s possession. They had loaned nothing to Muir which was either “ money, goods or things in action.” The transaction was the mere selling of their endorsement to Muir, which could only operate conditionally as against them, to be enforced by the bank at which Muir should get the notes discounted, in case he failed to pay. This conditional guaranty Ketchum & Co. sold to Muir for a compensation which they deemed equivalent to the risk, the guaranty being necessary for Muir to have in order to get his notes discounted at the banks in the city of New-York. There was no engagement on the part of the endorsers to Muir, that their names would enable him to negotiate • the notes, or that any loan of money should be made on the notes either directly or indirectly. In whatever light the transaction may be considered, it certainly cannot be demeed a “ device” to cover a usurious loan of money from Ketchum & Co. to Muir.
Had Ketchum & Co. been in any way connected with the subsequent loan of money upon these notes, it would have presented a question of fact for the referee or a jury to consider, and the finding might have made the whole transaction, taken together, a contrivance to cover up an usurious loan of money, through the agency of the banks at which the notes were discounted. But the referee has found no such fact in the case. It appears that one of the notes was discounted at a bank of which Ketchum was a director, but it was done without the direction or request of the board of directors, or of Ketchum.
It appears to me, therefore, that Ketchum & Co. stand in no different relation, as to the first two notes, than they would have done had Muir never used the notes for the purpose of a loan, after procuring their endorsement. If Muif had never made any use of the notes, I cannot conceive how Ketchum & Co,, could have been compelled, by any civil action, to return to Muir the three per cent, which they had taken as a compensation for their endorsement, on the. ground of ustiry; or that they could' have been convicted of a misdemeanor, under the act of. 1837 to prevent ustiry. The notes themselves, in such a *459 case, would have had no legal existence; and how could it have been made to appear that Ketchum had loaned to Muir any “ money, goods or things in action,” at an usurious rate of interest, according to the legal meaning of these terms?
If the transaction between Burr, the agent of Muir, and Ketchum, Rogers & Bement, in procuring their endorsement of the notes, was in violation of the statute against usury, then the notes were void in the hands of the banks which discounted them, and by whose acts the notes for the first time had a legal existence. It is not pretended that the banks were parties to any transaction in relation to the making of the notes. They discounted the notes in the ordinary course of business, and at the legal rate of interest. It will, I apprehend, be extending the act of 1837, to prevent usury, farther than ever it was designed, if banks and others who discount notes and bills of exchange, in order to secure themselves against a defence of usury, shall be under the necessity of ascertaining if some one of the endorsers on the notes and bills, offered them for discount, have not received a premium for their endorsement or guaranty above seven per cent, per annum. A rule which should declare these notes usurious, cannot be within the spirit and intent of the law; and, if adopted, would injuriously affect the transfer of negotiable paper, and open a wide door to the practice of collusion and fraud between the maker and endorser of negotiable paper. The risk of endorsing would be very much diminished, if every endorser of a promissory note, by talcing a premium or compensation of more than seven per cent, per annum for the use of his name, could on that ground maintain the defence of usury in a. suit against himself, when the maker had failed to pay. And yet this would seem to me to be consequent upon the doctrine sought to be maintained by the plaintiffs in error.
The conclusions at which I have arrived in my own mind, in regard to the first two notes, render it unnecessary for me to consider the question in relation to the two notes upon which this suit was brought; because it is not contended that the latter are usurious except for their connexion with'the notes which were endorsed by Ketchum & Co.
*460 Yet if the law was otherwise, and it was a settled question that the first notes were usurious, I should have great doubts, from the facts as they appear in the report of the referee, whether the notes which are the subject of this suit could be declared ugurjoqs also. Had these notes been discounted in the village of Auburn, where the maker and the endorsers reside, and the avails been applied to take up the first notes, it is very clear that no defence of usury could have been set up against them. That these notes were made with the intent and design on the part of Muir to raise money to pay the other notes, is admitted, but it does not appear that they were made for the purpose of being discounted by Ketchum, or that at the time the notes were discounted by Ketchum, there was any agreement that the avails were to be used to take up the other notes. The referee reports as, a conclusion of fact, that Ketchum, at the time, had good reason to believe, and did believe, that the avails were to be used for that purpose; but there was no agreement to that effect. Nothing occurred at the tjme the first notes were endorsed to induce Ketchum & Co. to believe that Muir would not take up the notes at maturity, without their aid. They gave their checks for the avails of the notes discounted by them, in the usual way, and, with the proceeds, Burr, the agent of Muir, paid up the notes at the bank, according to Muir’s directions. This transaction was in no sense a renewal of those notes. Ketchum & Co. could not renew them. They were not within their custody or control. The notes were not renewed, but paid up by the agent of Muir.
I am clearly of opinion that the judgment of the supreme court should be affirmed,
Sherman, Senator.
The only question of any importance that arises in this case is, whether a person can sell his credit or endorsement for the use and benefit of the maker of a note, in the- way found by the referee in this case, at a premium, without the transaction being pronounced by the law usurious.
The original notes were made for the purpose of raising money in New-York. Of this Ketchum was fairly apprised. The *461 bank refused to discount the paper without a new and further endorser. Muir as the agent of the maker applied to Ketchum to obtain his endorsement, which he gave for a premium of two and a half or three per cent. Had Ketchum taken the notes and given his own therefor, less the three per cent., it would have been a bald case of usury, Had he given his check upon the bank for them, less this discount, it would have been equally usurious. (Com. On Usury, 122; Lowe v. Mazarredo, id. 175, 6; Ackland v. Pearce, 2 Campb. 599.) But the argument is, that he did neither, and that instead of doing so, he endorsed the notes, upon the strength of which alone the maker was enabled to obtain the discount. He loaned his endorsement, his obligation upon the back of the maker’s note, (which is to be sure conditional, but in my judgment none the less his obligation, his agreement or engagement,) to be used and made available to the real holder, after discount, as a contract. And what is its nature ? What are the liabilities and the engagement which the law implies from it? When written out, it is a contract as well known and defined by the commercial law as the maker’s contract. It is an engagement that the endorser will pay the note to the holder at maturity, provided the same is not paid by the maker and prior endorser; and the consideration of the engagement, independent of the premium, is a corresponding obligation upon the part of the prior endorsers, that, in the event Ketchum shall be compelled to pay the note, they will repay him, unless the maker shall do so. This contract then is mutual, founded upon a good and valid consideration, and is well known to the commercial law. Had it been actually written out at full length, over the name of Ketchum, agreeably to the real nature of the contract implied by law, and been signed by all the prior obligors upon the paper, as it might have been, without in the slightest respect varying the nature or increasing the amount of the legal liability growing out of the transaction, and then have added the additional inducement in Ketchum’s contract in terms, being in consideration of the receipt from the hand of the maker of the sum of nine per cent, a year upon the amount of the notes, who would *462 have hesitated to pronounce the case one of bald and rank usury
The paper at this stage had not been discounted, and no notice was necessary to Ketchum. He entered into the obligation and loaned his chose in action, his engagement, his contract, at a usurious rate of interest. He thus obtains a direct engagement from the maker and prior endorsers, which is available to him at all events in case he has the note to pay, that they would repay him the face of the note. I agree with Mr. Justice Cowen' in his remarks on this point: “ He [Ketchum] takes more for his endorsement than the bank could for the actual discount; and, in the meantime, lends his money to or discounts for another at the rate of two and a third per cent., calls back the actual loan at the end of the four months, and redeems his endorsement at the bank by paying the principal. I speak of him as a lender, who will not let his $3000 lie idle. The transaction scarcely varies ,in form from an original discount at the double interest.”
But this was substantially a loan, and to regard it in any other light, it seems to me, is to shut our eyes to the real nature of the transaction.
It is not the case of a broker, distinct from the business of procuring loans, nor is it in any respect like the case of a stock broker, who, in the execution of the trust reposed in him, may charge a commission for advances made, on the ground of having performed services for his employer.
I think the judgment of the supreme court is erroneous and should be reversed.
On the question being put “Shall this judgment be reversed?” the members of the court voted as follows :
For reversal: Senators Bockee, Clark, Hard, Lawrence, Mitchell, Sherman, Smith, Varney and Works—9.
For affirmance: Senators Backus, Chamberlain, Deyo,
*463 Faulkner, Jones, Johnson, Lott, Platt, Putnam, and Rhoades—10.
Judgment affirmed.(a)

 A majority of the members of the court, it will be seen, were of opinion that the transaction between Muir and Ketchum, in reference td the first notes, was usurious; and had Mr. Senator Johnson thought the second notes were connected with the first, as did the referee and the supreme court, the judgment Would have been reversed.