## BILLLINGSLEY v. HARRELL.

1. Where a debtor in the first instance gives a mortgage on slaves, to secure his creditor, and the creditor afterwards takes from him another mortgage on the same and other property, extending the law day, and securing other creditors, the acceptance of the last mortgage creates an im-

plied contract not to proceed on the first, and therefore the possession held by the creditor, of slaves purchased at a sale under the first mortgage is not adverse, so as to render a sale by the trustee under the second mortgage void on account of an adverse possession. The title of the creditor acquired by his purchase, is subordinate to the last mortgage.

Writ of Error to the Circuit Court of Perry.

DETINUE, by Billingsley against Harrell, to recover certain slaves.

At the trial the plaintiff read in evidence a deed under date of 17th September, 1840, executed by John Huntington of the first part, William Howell of the second part, and the defendant of the third part. This, after reciting that Huntington is indebted to Harrell, by four promissory notes, the first for $1740, dated 12th July, 1839, due one day after date, to Frederic Becton, and by him assigned 20th March, 1840, to Harrell, without recourse ; the second for $120, dated and due 19th February, 1840 ; the third for $124 27, dated and due the 29th April, 1840 ; and the fourth for $705, dated 16th September, 1840, and due 1st January next thereafter. And after the further recital that the plaintiff Billingsley, and one Parish, are the securities for Huntington, on three several notes, payable to the Branch of the Bank of the State of Alabama at Mobile, the dates and sums not recollected, but the three amounting to $2,000, proceeds with the declaration that Huntington is desirous to secure Harrell in the payment of the sums due to him, and to save Billingsley and Parish harmless on account of their liabilities, then conveys to Howell certain described lots of land in the town of Marion, and certain slaves then named and described, upon the following condition, i. e., should Huntington fail to pay off and discharge the debt to the said Harrell and to the said bank by the 1st January, 1841, then and in that event the said Howell, so soon thereafter as the said Harrell, or the said Billingslea and Parish should direct, should take the property described, both real and personal, and, after a certain notice, expose the same to sale for cash, and out of the proceeds of such

sale first to pay Harrell whatever sum should remain due to him, and then to pay the said bank the sum remaining due to it, or to pay Billingsley or Parish such sums as either should have paid the bank.

The deed provides for Huntington's possession until the expiration of the time limited, and for its avoidance if the debts are paid by him. The plaintiff then proved by Huntington that he in July, 1839, became indebted to one Becton by note in the sum of $1740. At the time of receiving the money for which this note was given, Huntington executed to Becton a bill of sale or mortgage, dated 12th July, 1839, conveying to him the same slaves as were afterwards conveyed in the deed to Harrell before stated. At the foot of this instrument is the following memorandum or agreement. The condition of the above bill of sale is as follows: " I have borrowed and received from Frederic Becton $1740, for which amount said Becton has John Huntington's note, for which I have given the above bill of sale, which is deposited with George Hodge, and if the same be not paid to said Becton on application at Marion on the 1st January, 1840, then the said Becton is to cause the said Hodge to have sold at auction the above named slaves, or so many as will pay the above specified amount of $1740." This, as well as the bill of sale, was signed by Huntington. The witness further stated, that in November of the same year Becton returned this bill of sale and drew another in its stead, but substan-. tially similar. When the note became due the witness was not prepared to pay it, and proposed to the defendant to advance the money to Becton and take up the note, and to take the bill of sale which Becton held, as a security, and assume Becton's place. This was agreed to, and the defendant, in March, 1840, paid the sum to Becton and took from him a transfer of the note and bill of sale. The witness further stated he executed the deed of the 17th September, 1840, at the instance of the defendant, under the following circumstances: The defendant came to him shortly before the execution of that deed, and said he considered the slaves conveyed in the bill of sale to Becton assigned to him as not sufficient to pay the debt and accumulated interest, and desired the witness should give further security by executing a deed

of trust on his house and lot. Witness agreed to do this, provided the plaintiff and Parish, who were indorsers for him in bank, should, be embraced in the deed. The defendant consented, and the deed before stated was then executed. The three smaller notes set forth in this deed, except that for $120, were given for interest which had accumulated, or would so accumulate by the 1st January, 1841. They were founded on the interest growing out of the $1740 note, originally given to Becton. At the time of the execution of this deed, there was no understanding or agreement between its parties as to what was to be its effect on the bill of sale previously made to Becton. After the witness had made the deed, he informed the plaintiff and Parish that he had secured them in a deed of trust with the defendant. They both assented, and said they were satisfied. The bill of sale to Becton, which with the note was assigned to the defendant, was left in his possession when the witness left Alabama in 1843, and since that time he knew nothing of it. To the best of the witness' recollection, the defendant sold the slaves under the Becton bill of sale in December, 1844—[Most probably a clerical error for 1842.] The sale was made in Marion— they were put up to sale at the request of the defendant, who became the purchaser. The witness was not present at the sale. The slaves went into the possession of the defendant, and were in his possession when witness left the State in January, 1843.

The plaintiff then put in evidence a deed made by the defendant and William Howell, dated 12th March, 1841, which recites that Huntington was desirous of conveying to one Foster his house and lot, (the same conveyed by the trust deed,) and also that they had received satisfaction to the extent of the value of the same, and for the further consideration of one dollar, they thereby forever quit claimed, abandoned and gave up to the said Huntington, all right, title, claim or interest of any and every kind whatever, and consented to the aforesaid sale, or any other disposition the said Huntington should see proper to make. This deed was acknowledged before the clerk of the county court.

The plaintiff then proved by a witness that he as the agent for Foster bought the house and lot in Marion for the sum of

Billingsley v. Harrell.

$3000—$2500 in cash, and $500 on a credit until the first January. The settlement or payment of the purchase money was made in the office of defendant, but the witness did not remember whether the defendant was present. $1500 was counted and laid on the table, and $1000 was paid by one Cawthorn, as he said, to defendant. The witness could not tell who took up the money, but the note was made to Huntington for the other $500.

The plaintiff then proved his payment to the bank at Mobile by the substitution of his own paper and cash, of the notes for which he and Parish were sureties for Huntington, amounting to about $2500. It was also in proof that Huntington was altogether insolvent, and had removed from the State.

The plaintiff further proved that Howell, the trustee in the deed of trust, duly advertised the slaves under the terms of that deed. The slaves were not present, but in the possession of the defendant, who forbade the sale. The plaintiff became the purchaser of the three slaves now sued for, and received a bill of sale from the trustee.

The defendant then proved the execution of the bill of sale from Huntington to Becton before spoken of, which is the same as previously set out, except that one Buckley is named instead of Hodge to make the sale. This was duly recorded in the clerk's office, 9th December, 1839.

He then proved a sale of the said slaves by Buckley, and the execution of a bill of sale from him to defendant, dated 5th December, 1842.

On this state of proof the plaintiff requested the court to charge the jury—

1. That the deed of trust, in so far as it is embraced in the bill of sale or mortgage to Becton, was inconsistent with and repugnant to that, and operated in law as a surrender of the same. This was refused.

2. The court charged the jury, that if at the time of the sale by the trustee of the slaves to plaintiff, the defendant was in possession under his previous purchase under the Becton bill of sale, claiming them under the sale in good faith, then his possession was adverse, and the sale by Howell to the plaintiff was void.

3. The plaintiff insisted the defendant was to be charged with the price of the lots, &c. sold to Foster, and that this was sufficient to pay the debt secured to him by the Becton bill of sale; that this sale operated as a satisfaction of that bill of sale, and therefore the sale to the defendant under that was void, and the possession thereby acquired by the defendant was not adverse to the title of the trustee in the deed of trust, and so requested the court to charge. This was refused, but the court instructed the jury the defendant was to be charged with $2500 on that account, and if this sum was sufficient to pay the debts secured by the Becton mortgage, the same would be satisfied, yet if the defendant did not actually receive that sum, and believed he had the right to have said slaves sold under the Becton bill of sale, and that sale was made in good faith, the defendant being the purchaser, and that if he was thus in possession at the time of the sale to the plaintiff, then his possession was adverse to the title of the trustee, and the sale by him was void.

The plaintiff excepted to the refusal to give the charges requested, and to the charges given. The several rulings of the court in this particular, are assigned as error.

GARROTT, PECK, and PHELAN, for the plaintiff in error, insisted—

. 1. That the acceptance by Harrell of the deed of trust securing Billingsley and Parish as well as himself, operated as a surrender of the title under the Becton bill of sale. [Roberts on Frauds, 254 to 260; 7 Com. Dig. 384-5; 20 Viner's Ab. 127-8; F. Van Rensellaer v. Penniman, 6 Wend. 569.]

2. It also operated as a release of the previous title under the bill of sale in consequence of the covenants of Harrell. [Cuyler v. Cuyler, 2 Johns. Rep. 186; Phelps v. Johnson, 8 Johns. Rep. 54; Powell v. Forest, 2 Saund. 48; 5 Bacon's Ab. 683; Hastings v. Dickinson, 7 Mass. 153; Sewall v. Sparrow, 16 Johns. 34; 6 Call, 308.]

3. Harrell is also estopped by the deed accepted by him from asserting a different or paramount title. [Steel v. Brown, 1 Taunt. 381; Tarrant v. Terry, 1 Bay's Rep. 239; Dinn v. Carroll, 3 Johns. Ca. 174; Jackson v. Harbrook, 3 Johns. 331; Springsteer v. Schemerhorn, 12 Ib. 357; Fitch

v. Baldwin, 17 Ib. 161; 4 Comyn's Dig. 198-9; 201, note m.]

4. In all these views, the title now set up by Harrell is a subordinate one, and his possession not adverse. [Foster v. Goree, 5 Ala. Rep. 424.]

A. GRAHAM, of Perry, contra, argued—

1. The deed of trust was merely an additional security, as the object was to benefit Harrell, [6 East, 104; Cro. Jas. 176,] and the Becton deed was not delivered up. The lien of that deed might be quite important, and certainly was never relinquished. [Cro. Jas. 176; Viner's Ab. tit. lien; Roberts on Frauds, 259.] Besides, the question of intention is one of fact.

2. The doctrine of surrender has no application to personal property. [1 Shep. Touch. 306.]

3. The defendant insists his title was complete; but if only colorable, and his possession *bona fide* adverse to that of the plaintiff, the sale was void. [Goodwin v. Lloyd, 8 Por. 239; Brown v. Lipscomb, 9 Ib. 472; Dunklin v. Wilkins, 5 Ala. Rep. 199.] The distinction between this and the case of Foster v. Goree, 5 Ala. 424, is that here the party claims by a *former* and paramount title, while there it was one derived from the same source as the trust deed, and *subsequent* to it.

GOLDTHWAITE, J.—The principal question here is as to the effect, between these parties, of the second mortgage upon the one first executed by Huntington. In the aspect in which the case is presented, we deem it unimportant to inquire whether the first mortgage might not be set up to protect the property against a subsequently acquired lien, because if that effect is conceded, it does not follow the present defendant may assert a title under it as against that arising out of the one afterwards executed and accepted by him. It seems to us that the legitimate inference from the facts stated is, that the defendant waived all his rights under the first mortgage, and consented to look for his security alone to the second. There are many instances in which the law will carry out the manifest intention of the parties, by giving to deeds an effect different from that the mere terms will ordinarily indi-

cate, and a party is frequently estopped by his own acts from asserting a title which otherwise would prevail. Thus a release to one of several joint obligees may be pleaded in bar by all, and a covenant not to sue is sometimes construed to be a release. [2 Saund. 48, a.] So the acceptance by a tenant of a new lease of the same premises during the continuance of a former lease, has been deemed a virtual surrender of the first, when such a presumption arose from the acts of the parties. [Van Rensellaer v. Penniman, 6 Wend. 569.] And where one had accepted a deed from another, it has been held he is estopped from asserting title in himself to show a breach of the grantor's covenant of seizin. [Fitch v. Baldwin, 17 Johns. 161.] In the present case it will be seen both mortgages secure the same debts to the defendant, who by the terms of the first was at liberty to sell the slaves after January, 1840. By the terms of the last, the law day is fixed one year later. It cannot be supposed the law would permit the party, after impliedly if not expressly stipulating that the mortgagor should retain the slaves until the later period by joining in and thus accepting the deed, to proceed under the former mortgage. And if in this respect that is set aside, there is precisely the same reason to prevent the trustee therein named from acting, to wit, that the parties have stipulated for the action of another trustee.

It follows as the necessary result of these views of the effect, as between these parties, of the acceptance of the second mortgage, that it must be considered as superseding the first, and the defendant is really holding the slaves under a title which in point of law is subordinate to that under which the plaintiff claims. This being established, the principle settled in Foster v. Goree, 5 Ala. Rep. 424, as well as Echols v. Derrick, 2 Stewt. 144, is entirely applicable, and controls the case.

In our judgment the court erred in charging that the possession of the defendant was adverse to the title purchased by the plaintiff, and the sale for that reason void.

Judgment reversed and cause remanded.