Hurtt *vs.* Woodland et al.

(Decided January 10th, 1866.)

---

JAMES W. HURTT *vs.* SAMUEL WOODLAND AND OTHERS, BY THEIR NEXT FRIEND AND GUARDIAN DAVID C. BLACKISTON.

LANDLORD AND TENANT: CONTRACT, CONSTRUCTION OF : LEASE, SURRENDER OF. —J. F. W. executed on the 19th day of August, 1856, to J. W. P., a lease of his farm for four years from the 1st of January, 1857, reserving as rent one-half of all the grain raised on the farm, deducting seed wheat; also one-half of the potatoes, if more than five bushels are planted ; also, one-half of the apples each year; and the tenant bound himself to sow one field in clover each year during the term. In the spring of 1857, J. F. W. planted one field of twenty-five acres in peach trees, which in 1857 and 1858 was

Hurtt *vs.* Woodland et al.

cultivated in corn. This field becoming yearly less productive from the growth of the trees, in January, 1859, the said J. F. W. agreed to lease the same to the said J. W. P. for one year, the latter agreeing to furnish for said field two tons of Peruvian guano, and to work the same faithfully, in consideration whereof the former agreed that the latter should take therefrom eight hundred bushels of corn. The latter having assigned his interest in said lease and crop for the year 1859 to J. W. H., who received therefrom eight hundred bushels of corn, and also gathered and sold therefrom a crop of peaches, and received the money therefor. J. F. W. having in the meantime died, his heirs-at-law brought suit against J. W. H. to recover the value of the peach crop, HELD:

1st. That the relation of landlord and tenant as to the peach orchard field continued, notwithstanding the subsequent agreement. That under the stipulations and reservations of said lease, the tenant was entitled to the crop of peaches, and that his right thereto was in no way impaired by the subsequent agreement.

2nd. That the execution of the agreement cannot be considered a surrender of the lease.

PRAYERS AND INSTRUCTIONS BY THE COURT: FRAUD.—The defendant's prayer in said action, after reciting the evidence in the cause, asked an instruction that the facts were proper for the jury to consider as "evidence tending to prove fraud" by J. F. W. on J. W. P., HELD:

That the instruction was calculated to mislead the jury, who might have well supposed that the Court was instructing them as to the *sufficiency in fact* of the evidence to prove the alleged fraud.

APPEAL from the Circuit Court for Kent county.

This was an action by the appellees against the appellant to recover the value of a crop of peaches alleged to have been wrongfully taken by the appellant, assignee of the tenant, from lands held by the tenant under a lease, and the proceeds of which had been claimed and retained by the appellant.

The facts of the case are stated in the opinion of this Court.

The cause was argued before BOWIE, C. J., and GOLDSBOROUGH, COCHRAN and WEISEL, J.

*George Vickers*, for the appellant, submitted the following points :

1st. That the paper marked B, of 31st January, 1859, is not a lease, and cannot operate as such to work a surrender of the subsisting lease between Woodland and Peacock.

2nd. That the paper B, if not a lease, is not such a contract as would change the relation of the parties as landlord and tenant, and effect a surrender of the existing lease between them.

3rd. That if the said instrument B is a new lease between the parties, the landlord could only take what is reserved by the terms of the lease, and not the peach crop, which was not referred to or mentioned.

4th. That the testimony offered by the defendant, now appellant, tending to prove fraud, was erroneously rejected by the Court.

And the appellant's counsel argued upon the first point, that the agreement of the 31st January, 1859, marked B, is not a lease ; that a lease is said by *Woodfall, Land. & Ten.*, 56, to be a contract between parties, by which one conveys any lands or tenements to the other for life, for years, or at will, but always for a less term than the party conveying has in the premises. In *Archibold, Land. & Ten.*, 2 (53 *vol. Law. Lib.*,) a lease is declared to be a contract in writing, under seal, whereby a person having a legal estate in heriditaments, corporeal or incorporeal, conveys a portion of his interest to another, in consideration of a certain annual rent, or render, or other recompense.

It will be observed that by the agreement of January 31st, 1859, Woodland agreed to allow Peacock for his services, the said quantity of corn. It was no lease ; the consideration is certain conditions ; they are the furnishing of two tons of guano, tilling the land, and taking eight hundred bushels of corn, (and saving the fodder,) a full

crop according to the testimony, in its then condition, for his (Peacock's) services. It was not designed that Woodland was to receive any grain or rent, and consequently none was reserved. The field was to be untouched. Peacock could not have cultivated it in corn under his lease; it would have been against the usage and custom of the country; but to gratify his landlord, P. agreed to cultivate as an extra or outside tillage on certain terms, but it never was intended to be a lease; the paper is destitute of some of the essential features of such an instrument, and it was not necessary it should have that form or character, to carry into effect the honest desire and purposes of either party. No estate was parted with by Woodland, no new lease, *quasi* lease, was accepted by Peacock, and the insertion of the name in a single instance cannot convert it into an instrument, whose characteristics are essentially different.

But if it had the form and some of the attributes of a lease, the want of others would render it ineffectual as such. It will be seen that the paper professes to lease the property for one year, but it contains no word about the commencement or termination of the alleged leasehold. In *Woodfall's Land. & Ten.*, 57, 73, it is laid down at sec. 5, that a lease for years must have a certain commencement, when it takes effect in interest or possession; a lease for one year, or half a year, constitutes the lessee tenant for years; the same doctrine is found in *Com. on Land. & Ten.*, 82, (*Law Lib., No.* 10.) In the instrument of writing under consideration, no time is fixed for the beginning of the tenancy; it does not speak of a year from the date, nor from any other period, and is dated 31st January after the renting of property usually takes place. But to make a valid lease, rent must be reserved. Rents are reduced to rent service, rent charge, and rent seek. In each, a rent is specifically reserved. In every good reservation, these

things must occur.   It must be by certain and apt words ; thus a lease for years, reserving rent after the rate of £18 a year, is void for uncertainty.   It must be of some other thing issuing or coming out of the thing granted, and of such a thing as the grantor may have a remedy by distraint.   *Woodfall, Land. & Ten.*, 80.   The *reddendum* of a lease usually defines the rent to be paid, to whom, at what time, how and where.   *Com., Land. & Ten.*, 96.   *Arch., Land. & Ten.*, 30.

The agreement between Woodland and Peacock, of 31st January, 1859, is radically deficient in the principles and elements of a valid lease.   The word "rent" is not mentioned, no part of the crop is reserved, nothing is referred to for Woodland's benefit, except the "fodder," which is to be "saved" for him, not as rent, but as a service of Peacock, for which service, in part, he was *to* take the specific quantity of grain mentioned.   Neither can it be brought under the demise of land under our statute law, which provides a remedy by distress for a portion of crops, as a half, third, or specific quantity.

If it be not a lease, no presumption arises of a surrender by Peacock of one lease that he might take another.   A surrender is defined in *Com., Land. & Ten.*, 336, to be, "a yielding up of an estate for life or years to him that hath the immediate reversion or remainder, wherein the particular estate may merge or drown by mutual agreement between them.   See also, *Arch., Land. & Ten.*, 96, (*Law. Lib.*, 53.)

Where there is possession the surrender must be in writing, and cannot be by parol.   A surrender in fact is made by express words.   The statute of frauds requires a surrender to be in writing, or by "act and operation of law."

The last mode of surrender is where the parties, without

express terms of surrender, do some act inconsistent with the subsisting relation of landlord and tenant, and implying an intention that the lessor should be in the same relation as if an express surrender had been made; as if the lessee take a new lease from his lessor, he thereby admits that the landlord is in as good condition to grant a new lease as if the old lease had been expressly surrendered. *Com., Land. & Ten.*, 339, 340. To make it a surrender by operation of law, the second lease must be in all its essentials a complete and operative lease, because no implication arises, unless one perfect lease is substituted by another, and the existence of the last is inconsistent with that of the first.

2. Upon the second point, having endeavored to show that the second paper, B, is not a lease, but only an agreement for cultivation of an orchard, we inquire if it is such an instrument as effectually abolished the relation of landlord and tenant, for that portion of land embraced by its terms. A case referred to in *Com., Land. & Ten.*, 343, is relied upon as an authority for such change of relation. It is that of the owner of a Ferry, having demised it, the tenant subsequently became the servant of the lessor, and conducted it for the benefit of the owner upon stipulated wages, which were paid. There the surrender was implied, or by operation of law. It is the case of *Peter vs. Kendal*, 6 *Barn. & Cress.*, 703. The peculiar facts worked a surrender, because the relation of the parties as landlord and tenant was entirely destroyed, and they became as master and servant, a relation entirely different and irreconcilable. It was there held a surrender, because of the radical change of duties and relation. To receive wages for labor and service in reference to the whole thing demised, was the opposite of paying rent for it and treating it as his own during the entire term. But in the present

case the relation was not altered; the duties in their nature were the same as those of a tenancy—the cultivation of the land; they did not interfere with the general terms and integrity of the lease, as the land to be cultivated, being but a portion of the demised premises, could not have been planted in regular rotation of crops. It was in fact but a special agreement, outside the lease, for a particular purpose, and which might or not have been entered into without affecting the character or terms of the lease, or the relation of landlord and tenant. If it be not a lease nor contract for cultivation of an orchard, but an agreement for a lease as described in 1 *Arch., Land. & Ten.*, 22, it cannot be construed as a surrender, and there is no case which has fallen under the counsel's observation where an agreement for a lease has been construed to have the effect upon an executed and existing lease, as that of a new and perfect lease between the same parties. There can be no surrender of a lease at common law except by lease under seal.

3rd point. But for the sake of the argument, and to meet that aspect of the case, we assume that if the agreement B was a lease, the landlord could not claim the fruit growing on the trees, as the only reservation was that of blades or fodder, stripped from the growing corn. If a lease, the land, according to the definition of it, passed to Peacock, the tenant; for a lease is a conveyance of the land for a limited time, with undisturbed possession in the lessee. The tenant is entitled to everything that grows upon the land, except by express contract this general right is modified. If a stranger, says Lord COKE, in 2 *Inst.*, 303, commit waste, the tenant shall have an action against the wrongdoer. It is said, however, in 3 *Lee*, 209, referred to in *Com., Land. & Ten.*, 577, that the reversioner may main-

tain suit for injury to the body of trees by a stranger, but the lessee, for the shade and fruit. The only claim a landlord can have to anything on, or raised upon the demised premises, must result from a saving and exception in the lease. The exceptions are always construed most strictly against him, upon the principle that a deed is to be interpreted more unfavorably to the grantor. In 1 *Shep. Touch.*, 77 and 78, and in *Com., Land. & Ten.*, 76, 77, it is said, that exceptions in leases must be in apt words, as "saving," "excepting," &c., because that which is excepted is reserved from the grant or lease, and does not pass by it. Under an exception of " all wood and underwood," trees, great and small, are generally excepted, but not fruit trees, which do not pass by the denomination of wood, or trees ; and in the later case, *Butler vs. Dunning*, 5 *Barn. & Cress.*, 842, where timber and other trees were excepted, but not the annual fruit thereof; apple trees were held not to pass. *Com., Land. & Ten.*, 78. *Woodfall, Land. & Ten.*, 92, 93.

In the agreement between Woodland and Peacock, there is no mention of trees or fruit as excepted. The whole field passes to Peacock, the mode of cultivation and application of a specific fertilizer designated, and also the quantity of grain Peacock was to get for his labor, but no reference was made to trees or fruit, either by "saving" or "excepting," and consequently no right to the fruit could accrue to Woodland.

4th point. The appellant's counsel contends that the Court's refusal to give the instruction asked for by him in the third bill of exceptions, was error. The facts admitted and proved, are embodied in appellant's prayer below, and show that an undue advantage was attempted by Woodland upon Peacock.

The prayer was that the facts were proper for the jury to consider as evidence tending to prove fraud by Woodland on Peacock. It is the practice and policy of Courts, where fraud is alleged, to allow great latitude of proof to establish it, and it may be established by circumstantial and indirect testimony. In *Davis vs. Davis et al.*, in 7 *H. & J.*, 39, it is said that where the facts are so light and inconclusive that no rational, well constructed mind can infer the fact, which it is offered to establish, the Court will reject it ; in that case where no fraud was alleged, the proof was indefinite and intangible, and could not lead the mind to any definite and sensible conclusion. In *Cole vs. Hebb*, 7 *H. & J.*, 27, the Court state the rule to be, that where there is any legal, admissible evidence tending to prove the issue, the effect of that evidence is solely for the consideration of the jury, the word "tending" meaning that a rational, common sense intellect might draw from it the conclusion to which, by its production, it was desired to lead the jury, and that if there be any evidence tending to the proof, however weak, it ought to be submitted to the consideration of the jury ; and on page 28, it is said the total failure of evidence does not mean only the utter absence of all evidence, but it means a failure to offer proof, either positive or inferential, to establish one or more of the many facts, &c.

In *Turner vs. Turner*, 1 *H. & G.*, 162, the Court of Appeals reversed the decision below where slight testimony to prove the issue was rejected. In *Caton vs. Shaw and Tiffany*, 2 *H. & G.*, 14, facts apparently inconclusive were admitted to support the plaintiff's claim, and in *Smith vs. Walton*, 8 *Gill*, 77, the Court decided that the sufficiency in fact, of testimony to sustain the issue, is exclusively a question for the jury ; and in the case of *Morgan vs. Bitzenberger*, 3 *Gill*, 355, the same principle is recognized. In *Walter vs. Dashiell*, 1 *Md. Rep.*, 474, it

was held by the Court that any fact, however slight, if at all relevant to the issue, will be admitted in evidence.

In the case under discussion the facts and circumstances, the inequality of the parties, the illiterate and ignorant condition of the one, without adequate knowledge of the definite meaning and the rules for the construction of language, of the common or legal import of technical or other words employed in contracts, and of the effect of particular phrases on matters not spoken of or alluded to by the parties, and the carefully concealed, but real purpose of the other party, furnish tangible evidence to the mind of undue advantage essayed to be taken, and should have been submitted to the candid judgment and deliberate consideration of the jury.

*E. F. Chambers* and *J. A. Wickes* for the appellees.

The points made by the appellees are as follows:

1st. That the original lease executed by Woodland and Peacock on the 19th of August, 1856, and marked A, was surrendered by act and operation of law, so far as respects the peach orchard field, when the agreement of the 31st of January, 1859, marked B, was executed by the same parties.

2nd. The original lease being surrendered by the execution of the agreement, marked B, so far as respects the peach orchard field, that the peaches grown on that field, in the year 1859, by the true construction of that agreement were the property of Woodland.

3rd. That the prayer of the appellant was properly rejected by the Court.

1st. When the agreement of January 31st, 1859, was executed by Woodland and Peacock, the original lease between the same parties, marked A, so far as respects the peach orchard field, was surrendered.

A surrender of a lease for life or for years is either in fact or in law. A surrender in fact is made by express words, clearly manifesting the intention of the lessee to yield up his interest. The statute of frauds enacts, "that no lease for term of years shall be surrendered, unless it be by deed or note in writing, signed by the party surrendering the same, or his agent authorized by writing, or by act and operation of law." *Com., Land. & Ten.*, 337, 338.

The agreement of January, 1859, is not a surrender by express words, but a surrender under the last clause of the preceding section of the statute of frauds, by act and operation of law. A surrender by act and operation of law is where the parties without any express surrender do an act so inconsistent with the subsisting relation of landlord and tenant, as to imply an intention that the lessor should be in the same situation as if an express surrender had been made ; thus if the lessee take a new lease of his lessor, he thereby admits that the lessor is as much in a condition to grant a new lease as if the old lease had been expressly surrendered. *Com., Land. & Ten.*, 340. *Arch., Land. & Ten.*, 83. *Whitely vs. Gough, Dyer*, 140, *b*. *Hamerton vs. Stead*, 3 *Barn. & Cress.*, 478. *Livingston vs. Potts*, 16 *Johns*, 28.

An agreement for a new lease by a lessee, where he occupies the premises under the agreement, will operate a surrender of an old lease, although the lease contracted for was never granted. *Hamerton vs. Stead*, 3 *Barn. & Cress.*, 478.

The taking of a new lease by the lessee of the same premises is an act so inconsistent with the relation of landlord and tenant, as to imply a surrender of the old lease by the lessee. It is not, however, the only act from which the law implies a surrender.

The argument of the appellant appears to be based upon

the assumption that a new lease is essential to create a surrender by act and operation of law. The authorities, on the contrary, will fully sustain the position, that any agreement between the lessor and lessee showing that the relation of landlord and tenant, under the old lease, has been waived or annulled; or any acts done by mutual consent, from which it may be inferred that the old lease has been abandoned, will operate as a surrender.

Where the lessee was in possession, under a written lease, of a house, and before the rent was due the wife of the lessee delivered the key back to the landlord, who accepted it, it was held that the delivery back of the key by the tenant, *animo sursum reddendi*, and the acceptance thereof by the landlord, amounted to a surrender of the term by act and operation of law, within the statute of frauds. *Dodd & Davis vs. Aclorn,* 6 *Mann & Grang.*, 671.

Where the lessee underlet, and the lessor accepted the under lessee as tenant, which acceptance was afterwards assented to by the original lessee, the Court of King's Bench held that this amounted to a virtual surrender of the lessee's interest by act and operation of law. *Thomas vs. Cook,* 2 *Barn. & Ald.*, 119. *Com., Land. & Ten.*, 343.

Again, where the lessee during his term leases the premises, and the lessor at his request leases the property to a third person, it was held that the facts constituted a surrender under the statute of frauds. *Nickells vs. Atherstone,* 10 *Adol. & Ell.*, 943. It is evident, therefore, that the taking of a new lease by the lessee of the same premises is not the only act from which the law will imply a surrender of the old lease.

Why does the law imply a surrender of the old lease, when the lessee takes a new lease of the same premises? The reason is apparent. The old and the new leases cannot co-exist. Under the old lease the lessor has no right

to give a new one, or the lessor to accept, and by taking a new lease the lessee impliedly admits that the lessor has the right to grant it.

It is not material or necessary in considering the question at issue that the contract between Woodland and Peacock, executed 31st of January, 1859, should be construed to be a lease ; on the contrary, grant that it wants some of the attributes of such an instrument ; suppose it to be a contract of hiring, by which Woodland, who was anxious to have his peach orchard cultivated, hired the services of Peacock for that purpose, and agreed to pay him for such services, in fact, all the corn he could raise on that field, the acceptance of a new lease by the lessee is but one form of contract between the parties, from which the law implies a surrender.   Any other contract entered into between them, which changes their relations or rights in relation to the property, under the old lease, or which is inconsistent with the relation of landlord and tenant, under the old lease will have the same effect. *Peter vs. Kendall*, 6 *Barn. & Cress.*, 703.  *Com., Land. & Ten.*, 344.

The case of *Peter vs. Kendall*, 6 *Barn. & Cress.*, is conclusive on this point, and is a case very similar to the present.   In that case the plaintiff leased a ferry to B for a year for fourteen pounds a year, but a few weeks afterwards, B finding it unprofitable, it was agreed that the plaintiff should take the earnings of the ferry and allow B certain wages.   B continued the boatman of the plaintiff under this agreement, accounted for what he received, and was allowed the stipulated wages.   It was held that this contract operated as a surrender of the lease.   BAYLEY, Judge, said "B became the servant instead of the tenant of the plaintiff.   A new relation, which in regard to this property was wholly inconsistent with that of landlord and tenant, then took place with the consent of both parties,

that operated as a surrender by operation of law of the tenant's interest in the ferry.''

By the contract of 1859, between Woodland and Peacock, the relations of the parties their rights and obligations under the lease of 1856 were entirely changed, so far as respects the peach orchard field. Under the old lease Peacock could not cultivate this field; it was not in regular cultivation, and had he cultivated it, he would have violated his lease. Peacock, under the lease, was to give Woodland one-half of the grain raised, reserving the residue for himself; under the contract of 1859, for the service of cultivating the peach orchard field, he is to receive, in fact, all of the corn raised on it. It is evident from the agreed statement of facts that eight hundred bushels of corn, by the use of guano, could in all probability be raised on this field in 1859. This quantity Peacock is to receive for his services. Under the contract of 1859 Peacock assumes new obligations and acquires new rights. He ceases to be the tenant of Woodland, so far as respects the peach orchard field, and hires his services to him for stipulated wages, which he received. By entering into this contract Peacock admits that Woodland had power to make it, which he could not have had if the lease of 1856 had not been surrendered. *Com., Land. & Ten.*, 83.

A new relation, inconsistent with that of landlord and tenant, took place with the consent of both parties, which operated as a surrender in law of Peacock's interest, as tenant, in the peach orchard field. The expression in the statute of frauds, '' surrendered by operation of law,'' applies to cases, says Lord DENMAN in the case of *Nickells vs. Atherstone*, 11 *Jurist*, '' where the owner of a particular estate has been party to some act, the validity of which he is by law afterwards estopped from disputing, or which would not be valid, if his particular estate had continued to exist.

It is not necessary, as is assumed by the appellant in his argument, that the contract of 1859 between Woodland and Peacock, should have included the whole of the farm, in order to operate as a surrender of the lease of 1856. It appears to be conceded in argument, that had the contract of 1859 embraced the whole of the land demised, Peacock would in that event have ceased to be the tenant of Woodland, and have become his servant for a particular purpose, and for stipulated wages, and that thereby the lease of 1856 would have been surrendered. If this be conceded, on what principle can it be doubted that the lease of 1856, so far as respects the peach orchard field, was surrendered when Peacock executed the contract of 1859? By that contract his relations as tenant of that field were put an end to. He agrees to perform specified work for stipulated wages which Woodland agrees to pay.

The principle is well established, that where the lessee accepts a new lease of a part of the premises only, the new lease will operate as a surrender in law of the old lease, so far as respects that part of the premises comprised in the new lease. *Fish vs. Campion*, 2 *Rol. Abr.*, 498, 1. 50. *Arch., Land. & Ten.*, 83. *Com., Land. & Ten.*, 344, *Marg. paging.*

The authorities heretofore cited clearly sustain the position, that any contract in reference to the demised premises, which alters the relation of the parties to a lease, in a manner inconsistent with the relation of landlord and tenant under the lease, will operate as a surrender of the lease. If therefore such a contract embraced but a part of the demised premises, it will operate as a surrender of the lease as to that part. It is clear that Peacock did not cultivate the peach orchard field during the year 1859, as lessee under the lease of 1856. The cultivation of that field in 1859 would have been a violation of the lease of 1856. He did not give Woodland one-half of the corn

raised on that field in 1859, as rent under the lease of 1856, but appropriated the whole of it to his own use. In what capacity then did he cultivate the field? He could not cultivate it as lessee, and also as the servant of Woodland, working for stipulated wages. The relations were inconsistent. We contend, therefore, that the conclusion is irresistible, that while the lease of 1856 may have been operative as to the other portion of the farm, it was surrendered, so far as respects the peach orchard field.

Should the contract of 1859 be construed to be a lease, then it is admitted that the lease of 1856 was surrendered.

No particular words are necessary to constitute a lease. The intention of the parties is the proper criterion by which the nature of the instrument is to be judged. *Com., Land. & Ten.*, 74.

Where the language used was, that "A shall have, occupy and enjoy land;" or, "I will you shall have a lease for twenty-one years;" or, "A doth let certain lands to B for such a term;" in each of these cases the instrument was construed to be a lease. *Com., Land. & Ten.*, 61, 62, and 63. Neither is it necessary that the time from which a lease shall commence shall appear. It shall be taken to commence from the delivery of the lease, if no certain time is mentioned. *Com., Land. & Ten.*, 80. The first prayer of the appellee was therefore properly granted by the Court.

2nd. The lease of 1856 being surrendered by the contract of 1859, so far as respects the peach orchard field, the peaches grown on that field, in 1859 and 1860, by the true construction of that contract, were the property of Woodland or those claiming under him. This proposition has been incidentally discussed in considering the first point made by the appellees.

If the contract of January 31st, 1859, is a contract of

hiring, (which is the view of the counsel for the appellees,) by which Peacock parted with his interest as tenant in the peach orchard field, and hired his services to Woodland for certain wages, then it is clear that Peacock had no other interest in the product of that field, or the profits arising therefrom, than the eight hundred bushels of corn which he was to receive for such services—all other products of the field belonged to Woodland.

Should the agreement of 1859 be construed by the Court to be a lease or an agreement for a lease, it is apparent that the rent reserved by Woodland is all of the products of the field, except the eight hundred bushels of corn. Rent is not reserved *eo nomine*, but the paper shows clearly the intention of the parties. The reservation of rent requires no technical language. It may be made in any form of words which express or imply that a return of something which was not in the lessor before, is to be made in lieu of the property demised. *Arch., Land. & Ten.*, 34. *Com., Land. & Ten.*, 99.

3rd. The prayer of the appellant was properly refused by the Court. There was no evidence of fraud intended or practiced by Woodland.

The rule is too well established in this State to be questioned, that the legal sufficiency of evidence is a question of law, of which the Courts are the exclusive judges. If there is no evidence to support the issue, or if the testimony is so light and inconclusive that no rational, well constructed mind can infer from it the fact which it is offered to establish, it is the duty of the Court to withhold it from the jury. *Davis vs. Davis*, 7 *H. & J.*, 39.

The doctrine laid down in the case of *Davis vs. Davis*, is sustained in the latter case of *Cole vs. Hebb*, 7 *G. & J.*, 27 and 28. In the case of *Cole vs. Hebb*, in commenting upon the opinion delivered in *Davis et al. vs. Barney*, 2 *G. & J.*, 282, in which the law on this subject is declared

to be, " that where there is any legal, admissible evidence tending to prove the issue, the effect of that evidence is solely for the consideration of the jury;" the Court say, " the word ' tending,' as there used, was not designed by the Court to be understood in its literal or vulgar sense, but to be understood according to its legal intendment, namely, as so tending to prove the issue, that a rational, common sense intellect might draw from it the conclusion to which, by its production, it was desired to lead the jury."

Applying this rule it is hardly possible to draw from the evidence in this case the conclusion, that the contract of 1859 was fraudulently designed by Woodland, and that the language used in the wording of the contract was intended to entrap Peacock.

*O. Miller* for the appellant, in reply.

The argument of Judge CHAMBERS seems to abandon altogether the idea that this was a new lease, and he thus gives up the theory that there was any surrender by operation of law, of the existing lease of 1856, by reason of the execution of a new lease, which is put in the books as the usual mode by which such a surrender is effected. He assumes it was a mere contract, and not a lease, and so construing it, insists that its mere execution put an end to the original lease ; and then further contends, that construed as a contract it does not give the appellant the peaches. He is forced to this argument to avoid the stress of the appellant's point, that if paper B is to be regarded as a lease, then, under it, everything growing on the land belongs to the tenant, except what, by the terms of the lease, is reserved to the landlord, because by the very nature of a lease, the tenant becomes entitled to the undisturbed possession of the land for the term ;

the landlord cannot even put his foot upon it without committing a trespass, and he can take nothing from the land except what is reserved to him by the lease; everything else belongs to the tenant.

But if we consider this paper as a mere contract, what then? Did its mere execution, as the instruction puts it, work a surrender of the original lease by act and operation of law? Or, taking broader grounds, did the execution of this paper, or anything done under it, work such a surrender? It is respectfully submitted, that it has no such effect, as has already been shown in the opening argument for the appellant.

" A surrender, by act and operation of law, is where the parties, without any express surrender, do an act so inconsistent with the subsisting relation of landlord and tenant, as to imply an intention that the lessor should be in the same situation as if an express surrender had been made." *Com., Land. & Ten.*, 340. *Arch., Land. & Ten.*, 83.

If such a contract works a surrender of the lease, " by act and operation of law," then it will follow that any act or agreement in writing or by parol, by which any of the *modal* conditions or terms of a lease may be in any particular varied or changed, will have the same effect. Such, however, it is confidently submitted, is not the law; Courts so far from being anxious to extend this doctrine of the surrender of leases by act and operation of law, are, on the contrary, inclined against it, and only apply it in plain cases, where the facts exclude any other reasonable mode of solving the difficulty. The rule as laid down in the elementary books, *Comyn* and *Archibald*, has already been stated. The cases relied on by the other side, so far from sustaining the position for which they are cited, do but strengthen that of the appellant.

If all the cases cited by the appellees be examined they will all be found to be cases where the acts relied on

showed an unequivocal intention to destroy and put an end to the existing relation of landlord and tenant. Here it is confidently submitted no such intention can be inferred, but exactly the opposite. The tenant never intended to give up his rights under the lease, and destroy the existing tenancy as to this field, but merely for the accommodation of the landlord, who wanted the field in which his trees were planted, and which he would soon possess on the expiration of the lease, cultivated out of its terms, and the agreement was made simply to carry out this purpose, and not in any way to interfere with the existing relation under the lease of 1856. It was a mere contract subsidiary to the lease and not subversive of it, for the cultivation of a particular field for a particular year, which otherwise the tenant would not have been bound then to cultivate.

The argument of the appellees on the second exception, contains the essential vice of assuming the very position under discussion, viz: that the execution of this agreement put an end to the lease. He assumes this and then argues upon the construction of the contract, as if it were not a new lease, but simply a contract made by parties between whom no other relation ever existed or was ever intended to exist, save that which the contract itself created. Now with the construction of this contract in *that aspect*, this Court in this case has nothing to do. It was either a new *lease* or a mere contract not amounting to a lease; if the former, then there was a surrender *pro tanto* of the existing tenancy, and the relation of *landlord and tenant* thenceforth existed under this *new lease*, and in that case, upon all the authorities the peaches belonged to the appellant, because there is no *reservation* of them to the landlord; if the *latter*, then the only inquiry is, did it operate a surrender by operation of law of the existing lease of 1856? I have endeavored to show by reason and authority that it did not

have such effect, and if I am right in this, then the peaches belonged to the appellant under the original lease.

WEISEL, J., delivered the opinion of this Court.

James F. Woodland executed on the 19th day of August, 1856, to Joseph W. Peacock, a lease for his farm in Kent county, called "Marshy Point," for the term of four years, commencing on the first day of January, 1857, reserving as rent one-half of all the grain raised on the farm, deducting seed wheat; also, one-half of the potatoes if more than five bushels were planted. The landlord likewise reserved to himself one-half of all the apples each year, and the tenant bound himself to sow one field in clover each year during the term. These were the only reservations and stipulations in the lease.

It appears from the agreed statement of facts in the case that Peacock took possession of the farm under the lease on the first of January, 1857; that in the spring of that year a field of 25 acres on the farm was planted in peach trees by the landlord, Woodland; that this field, called then and afterwards the peach orchard field, had been cultivated in corn in 1856; that it was also cultivated in corn in 1857 and 1858, the two first years of the lease, by the tenant, producing 1200 and 800 bushels of corn in those years respectively; and that it was not in regular cultivation in 1859. It was also admitted in said statement that a field planted in peach trees will produce less corn each successive year, other things being equal; that ploughing peach orchards and cultivating them in corn are considered beneficial to the trees, their health and growth, and that ordinarily peach trees do not bear fruit that remains and matures until the fourth year, and the yield is generally not large prior to the trees being four years old.

On the 31st of January, 1859, the third year of the term

having commenced, an agreement in writing, signed by Woodland and Peacock, was entered into in these words : "This agreement, made this day between J. F. Woodland and Joseph Peacock, both of Kent Co., Md., witnesseth that the said Woodland for and in consideration of certain conditions hereinafter mentioned, agrees to lease to the said Peacock, the peach orchard field at Marsh Point, for the term of one year ; the said Peacock agrees to furnish two tons of Peruvian guano for said field, and to till it in corn, the said corn to be planted and worked in farmer-like manner, and the fodder saved in like manner for said Woodland, who agrees for said service of Peacock, to allow him off of said field of corn to take eight hundred bushels."

It was proved in the cause that this agreement was the result of a conversation a few days before between the parties, in which Peacock told Woodland that he did not think he could till the peach orchard again in corn, that it was not fair he should till it and receive nothing from it, stating his losses the two preceding years in consequence of the peach trees.

Peacock, according to the agreed statement of facts, cultivated the peach orchard field in 1859, in pursuance of the agreement, and assigned all his interest in the lease and crops in the summer of that year to James W. Hurtt, the appellant, the defendant below, who received eight hundred bushels of corn from the field, and also gathered and sold the peaches from the trees both for that year and the year following, and received the money therefor. Woodland, the landlord, having died in March, 1859, this suit was brought by his heirs at law, (the appellees,) to recover the value of the peach crop of that year.

This controversy as to the right to the peaches, depends upon the character and construction of the agreement of 31st of January, 1859.

By the appellees it is contended that it operated as a surrender of the lease so far as the peach orchard was concerned, and the fruit became their right and property. The two prayers of the plaintiffs below were based upon this construction and assumed legal effect of it. By the first of these prayers the instruction was asked, that if the jury believed that the lease and the agreement had been executed by the parties to them, then the lease was surrendered and put an end to by the agreement, so far as concerned the peach orchard field ; and by the second, that by a true construction of the agreement, the peaches growing on the peach orchard field were not conveyed to Peacock, the tenant, but remained the property of Woodland, the lessor.

It is not pretended that the lease, as to this field, had been surrendered in any way at any time previous to the agreement. The agreement itself, and what took place under it, are relied upon by the appellees as a surrender of the lease by operation of law ; not by way of a new lease ; for if so construed, then the lessee would be clearly entitled to the peach crop, inasmuch as it was not reserved by the instrument to the landlord.

Can it then be construed or regarded as a contract, so inconsistent with the terms of the lease and the relation of landlord and tenant under it, as to operate a surrender of the lease as to this field, or to change the rights of the tenant, under the lease, to the peach crop ?

We do not see that such is the character or legal effect of the agreement. Looking at it and its attendant circumstances as given in proof, we discover nothing to change the relation of landlord and tenant that existed between the parties under the lease. The field was a part of the demised premises which the landlord, during the lease, had been permitted to plant in peach trees. To encourage their growth the tenant had cultivated it two successive years in

corn, and as he alleged, at a loss, rendering half of the yield to his landlord as rent reserved by the lease. It was not in regular cultivation in 1859, the next year. To repeat the cultivation was beneficial to the landlord in the growth of his trees, but was not the duty of the tenant, who was unwilling to expend another year's labor upon it without an increased remuneration, a share larger than that which the terms of the lease would afford him, hence the agreement, in which the only change is in relation to this field, stipulating for another year's cultivation of it in corn at an increased compensation to the tenant for the service and outlay he was to bestow, and the risk he was to incur, the landlord being satisfied with the fodder and all the corn raised above 800 bushels as his portion. The agreement is entirely silent as to the peaches, and nothing was said by the parties about them when the negotiation was in progress. Whatever opinion the landlord may have secretly entertained at the time, and afterwards openly expressed respecting his right to them, it is very clear from the tenant's declarations in reference to the subject, that he did not design to relinquish by the agreement his rights as tenant to the fruit. So far as his consent was necessary to the disturbance of the relation of landlord and tenant, it had not been given. The terms were only varied as to a portion of the leased premises, but the relation itself, and all rights not affected by the agreement, remained as before. If the agreement had not been entered into, the peaches were the tenant's, and there is nothing in the agreement itself, or in its mode of execution, which could have the effect of depriving him of this right. If he meditated any sharpness in the bargain, he had the benefit of it in the corn which he expressly stipulated for. If the landlord plumed himself upon his sagacity, he failed in the scheme by not being as equally express in reserving the

fruit of the trees ; the bare mention of which would in all probability have defeated the arrangement, and left the field without the additional stimulus of a year's cultivation.

We therefore are of opinion that the relation of landlord and tenant, as to this field, continued notwithstanding the agreement, and that the tenant's right to the peaches was not impaired by it. The Court below was therefore in error in granting the prayers of the plaintiffs.

Having determined that the agreement did not deprive the lessee of his right to the peaches, it might be immaterial to pass upon the instruction of the Court below on the defendant's prayer.

But the Court think, on examining the prayer and the form of the instruction asked by it, in the light of the various decisions cited in the argument, that the Court below was correct in refusing the instruction sought. The question was not as to the admissibility of the evidence to prove fraud, for all the evidence was in for the purposes of the cause. But the instruction, if given, was calculated to mislead the jury, who might well have supposed that the Court was instructing them as to the *sufficiency in fact* of the evidence to prove the alleged fraud. *See* 16 *Md. Rep.*, 445. *Maltby vs. North W. Va. R. R. Co.*

> *Judgment reversed and*
> *procedendo awarded.*