LISTER AGRICULTURAL CHEMICAL WORKS

*v.*

ESTHER G. SELBY.

[Filed November 19th, 1904.]

1. A lease to a manufacturing corporation gave the privilege of purchasing the land leased, at the expiration of the term. The president was authorized to obtain a correction in the description of the premises. He did, in fact, obtain a new lease thereof, at the same rent for the same term, but the lease omitted the option given to purchase.—*Held*, (1) that the subsequent user of the property by the company and the payment of rent did not show notice to the directors of the contents of the second lease or acquiescence in its provisions; (2) that even if ratification by acquiescence were to be presumed, the acceptance of the second lease was not a surrender in law of the first lease, or of the term of years thereby created.

2. The lease gave to the lessee the privilege of purchasing at a fair valuation by appraisement.—*Held*, that there was sufficient certainty as to price to warrant a decree for specific performance.

On bill for specific performance.

*Mr. Charles L. Corbin,* for the complainant.

*Mr. Richard V. Lindabury* and *Mr. Robert H. McCarter,* for the defendant.

STEVENS, V. C.

This is a suit to enforce the specific performance of a contract. In March, 1893, Edwin Lister executed a ten years' lease to the defendant company of a plot of land adjoining the company's works in Newark. The lease contains the following clause:

"The party of the first part [Lister]   *   *   *   does grant, demise and to farm let unto the said party of the second part the property or grounds now occupied by the buildings of the said party of the second part, and used for the manufacture of fertilizer, glue, &c.,   *   *   *   with privilege of purchase at the expiration of the lease at a fair valuation by appraisement," &c.

On February 1st, 1899, William R. Weeks, as executor of Edwin Lister, executed another lease of the same land for the residue of the term granted by the prior lease. The reason for executing it does not appear on the face of the paper, except by inference. In the oral evidence it is vaguely stated that it was executed because the first lease was "imperfectly drawn."

The defendant's contention is that the company *accepted* the second lease and that this acceptance was a surrender, in law, of the first lease and of all its provisions. This the complainant denies. Comparing the two leases, we find that the term mentioned in the second lease expired on the same day (March 1st, 1903) that the term created by the first lease expired, and that their covenants are identical. There are three differences—*first,* the second lease describes the premises more precisely; *second,* it contains a restriction upon the use of the land not found in the first lease; and *third,* it omits the clause giving the option to purchase.

I am of opinion that the company did not accept the second lease at the time it was made, and that it has not ratified it by subsequent acquiescence. It appears that shortly after Edwin Lister's death his executor, William R. Weeks, a lawyer by profession, became president of the defendant company. The second lease was prepared by him. He executed it on behalf of the lessor, as executor, and on behalf of the lessee, as president of the company. It is attested by Edward Lancaster, the secretary of the company, who retained it after execution. The first lease was not canceled or given up, but remained, as before, in the custody of that officer. The first lease was specially authorized by a resolution of the board of directors, passed March 8th, 1893, which provided that the company would lease the land, with the privilege of purchase. No resolution authorizes the making of the second lease, and the minutes do not show that it was ever under discussion. Of the five directors, two are dead. Kehoe, one of the three survivors, swears that the taking of a second lease was not discussed or considered by the board. Robert Lister, another survivor, says that it was talked over; that he heard the directors say that the lease ought to be changed; that Weeks was president, and that they left it to him. He cannot recall any particular meeting at which this was said, nor does he remember what the change was to be. Lancaster, the secretary, has a vague recollection that the matter was discussed at some time prior to the making of the new lease, but he says that he may be mistaken. He thinks that Mr. Weeks' idea was that the first lease was "imperfectly drawn," and that because of the supposed imperfection the directors may have acquiesced in the making of a new one. The one person who could have given definite information on the subject, Mr. Weeks, the third surviving director, though present in court, was not called.

The utmost I am at liberty to conclude from the evidence is that in consequence of some supposed defect in the first lease the directors acquiesced in the suggestion of their president, a lawyer, that it should be corrected. The evidence does not show that this acquiescence was embodied in a resolution, recorded or unrecorded, or in any other formal corporate action taken before

or after the paper was signed. The by-laws were not offered in evidence, and so I must assume that if produced they would not show any authority in the president to surrender the term and to release the option to purchase. There is no evidence tending to show that the board, or any of its directors, with the exception of Mr. Kehoe, knew what the provisions of the new lease were, and Mr. Kehoe appears to have found fault when Mr. Weeks brought it to his attention.

It is undoubtedly true that a board of directors to whom the president of a company communicates his action in making a contract for and in the name of a corporation—action which it is within the power of the board to authorize, but which it has not in fact authorized—must disaffirm that action within a reasonable time. If the board does not disaffirm, it will be presumed to ratify. *Indianapolis Rolling Mill* v. *St. Louis Railroad Co., 120 U. S. 256.* But knowledge must precede acquiescence. It must, in the words of Chief-Justice Morton, in *Murray* v. *Nelson Lumber Co., 143 Mass. 250,* be shown "that the directors, or at least a majority of them, knew of the contract and its terms, and that with such knowledge they acquiesced in and adopted it."

Authority, whether given in express terms or by acquiescence, to make a correction in the first lease, so as to make it express more accurately the intention of the board, as evidenced by their resolution of March 8th, 1893, is quite a different thing from authority to vary from that resolution in a material and, as the board may well have thought, highly important particular. The subsequent user of the property, and the payment of the rent, gave no notice of what Weeks had done, for these remained the same and were just as referable to the old lease as to the new. *Bi-Spool Company* v. *Acme Company, 153 Mass. 404.*

If I had come to the conclusion that the new lease was ratified by acquiescence, I should still have thought that there was no surrender of the old lease; that the new lease operated to confirm and not to destroy it. It is well settled that "if a lessee for life or years take a new lease of him in reversion of the same thing in particular contained in the former lease for life or years,

this is a surrender, in law, of the first lease." *Shep. Touch.* *ch. 17 p.* *301; *Tayl. L. & T.* § 512. The instances given in Sheppard are a new lease, taken for a longer or a shorter term, or a new lease for the same term, taken on condition. The reason, obviously, is that the two terms cannot both subsist, in their integrity, at the same time. The lessor cannot effectively give again that which he has already given. And if both subsisted, double rent would be payable, which would obviously be contrary to the intention of the parties. Consequently, when the lessee accepts a new lease giving him a longer or a shorter term, or a defeasible term, in place of an absolute one, the law, in order to effectuate the paramount intent of the parties, says that the acceptance of the new lease by the lessee shall be, of itself and without further writing, a surrender of the old. Surrender "by act and operation of law" is expressly excepted from that provision of the statute of frauds which declares that no lease shall be surrendered unless it be by deed or note in writing. This reasoning loses much of its force when applied to grants of terms which are identical. Is it not more reasonable, in cases of this kind, in the absence of evidence to the contrary, to infer a confirmation of the term first demised than a surrender of it? Why should a lessee be deemed, by legal construction merely, to surrender a term, in order instantly to take it back at the same rent, where he still retains possession of the document which confers it? In so far as the contract provisions of the second paper respecting collateral matters—incidents of the term— are inconsistent with those of the first paper, they will, of course, on familiar principles, be held to abrogate them. Turning to the older digests, we find that this idea runs through the cases. In *Viner's Abridgment,* under the title "Surrender in Law," the author first states what shall be deemed surrender, and then what shall not be. Under the latter head are found the following cases: "If the lessee of a house accept a grant of the custody of the same house, no surrender is presumed." "If the king grants an office by patent, acceptance of a new patent of the same office is no surrender of the first." "If a lessor leases *de novo* to his lessee and another, it will be a surrender only for a moiety." The later authorities are to the same effect.

In *Biddulph* v. *Poole, 11 Ad. & E. (N. S.) 713,* Justice Erle, after stating that the doctrine of surrender was introduced for the purpose of giving effect to the intention—that it is presumed for the purpose of making a grant operative which would otherwise be without effect—in speaking of a lease which, not being a due execution of a power, had, nevertheless, been given expressly in consideration of the yielding up of two prior leases, said: "The lease, therefore, was unnecessary. It did not substantially alter the lessee's interest in the premises and was intended to confirm his interest under the subsisting leases. Now, it is not possible to conceive a more perverted application of the doctrine of 'giving effect to the intention of the parties than to hold that an instrument intended solely to confirm leases should be effective solely to destroy them."

In *Van Renssellaer's Heirs* v. *Penniman, 6 Wend. 569,* a second lease for the same term, at the same rent, had been accepted by the lessee. The first lease was terminable on three lives and gave to the tenant a right to compensation for improvements. The second lease was terminable on one of those lives only; that life having expired, one of the questions was whether the right to compensation for improvements, as it has been given by the first lease, remained. Chief-Justice Savage said: "Under these circumstances, and no surrender having in fact been made of the first lease or of the bond accompanying it, but both being retained by the lessee, I cannot believe that a surrender was intended. The authorities say that the surrender. in cases of second leases is presumed from the intention of the parties. In this case, every circumstance, except the fact of receiving the second lease, altogether rebuts the idea of an intention to surrender the right to compensation for improvements. If no surrender was intended or made, then the question arises whether both leases are in force, and whether rent is due on each. The only satisfactory answer which I can give is that the second lease was intended as a confirmation of the first." See, also, *Flagg* v. *Dow, 99 Mass. 18.*

The cases cited by the defendant are not authorities to the contrary. In *Lyon* v. *Reed, 13 Mees. & W. 284,* the court was dealing with quite a different question, viz., the effect of a demise

by the reversioner to a stranger, with the consent of a lessee in possession. Such a demise, Baron Parke held, would not amount to a surrender by operation of law. In *Enyeart* v. *Davis, 17 Neb. 228; 22 N. W. Rep. 449,* the question here discussed was not considered. The new term appears to have expired on a different day and to have been given as the result of a settlement in which, as the evidence showed, it was intended to cancel the prior lease *in toto. Hoag* v. *Carpenter, 18 Ill. App. 555,* is quite irrelevant.

Coming to the case in hand it would seem, from an inspection of the two instruments and aside from the oral evidence on the subject, that the second was given to correct a description of the land demised by the first. The first lease was not, in point of fact, given up, and manual delivery is regarded as material on the point of surrender. Thus Baron Parke, in *Lyon* v. *Reed, supra* (on page 304 of the report), speaking of the ordinary case of different terms, says: "No surrender by deed is necessary where, as is commonly the case, the former lessee takes the new lease, and all which is ordinarily done to warrant the statement of the surrender of the old lease as a part of the consideration for granting the new one is that the old lease itself—the *parchment on which it is engrossed*—is delivered up." In *Egremont, Earl of,* v. *Courtenay, 11 Ad. & E. (N. S.) 702, 711,* Justice Coleridge referred to delivery up as evidence of intention, and Chief-Justice Savage, in the case already quoted, referred to non-delivery of the lease then before him as evidence negativing the presumption of surrender. The omission of the clause giving the option to purchase proves nothing. It does not concern the term one way or the other, and the restriction upon the user would be equally effective whether the term created by the first lease did or did not subsist.

If the leases be regarded merely as contracts and not as instruments conferring estates, the result is the same. The rule is thus stated in *Clark Con.* § *229:*

"Where it is claimed that a contract has been discharged by a new contract, or by the introduction of new terms, the intention to discharge must distinctly appear to give rise to such an implication from the inconsistency of the new terms with the old ones."

The argument was that the covenant to surrender up the premises at the expiration of the term contained in the second lease was inconsistent with the option to purchase found in the first lease. But precisely the same covenant is found in both leases, and it can therefore be no more inconsistent with the terms of the one than of the other. It is obvious that in both the covenant has reference merely to the term; that it is quite independent of the option to purchase.

Defendant's next contention is that there is not sufficient certainty as to price to warrant a decree of specific performance. The clause which gives the option is "with privilege of purchase at the expiration of the lease at a fair valuation by appraisement." It is argued that the court will not decree the performance of the contract until the price is determined. The cases relied upon prove the contrary. Thus, in *Domestic Telegraph Co.* v. *Metropolitan Telephone Co., 39 N. J. Eq. (12 Stew.) 160;* affirmed, *40 N. J. Eq. (13 Stew.) 287,* Vice-Chancellor Van Fleet said: "Where the parties have agreed that the land shall be conveyed, not upon a price to be agreed upon themselves, but at a fair price or at a fair valuation, there the parties having fixed a standard or measure of value without having designated any particular method for ascertaining the price, the court may, without making a contract, ascertain the price according to the standard fixed by the contract and enforce the contract." In the prior case of *Van Doren* v. *Robinson, 16 N. J. Eq. (1 C. E. Gr.) 256,* the covenant was that P. W. "will reconvey \* \* \* for a fair price," and Chancellor Green said: "In this case the mode in which the price shall be fixed is not designated in the contract. It is required simply that it be a fair price. To ascertain that value by any mode of investigation will conflict neither with the letter nor with the spirit of the contract. I think, therefore, the contract is such as will justify a decree for specific performance." See *Jackson* v. *Jackson, 19 Eng. L. & Eq. 546; Fry Spec. Perf.* § *219.* These remarks apply to the present case. The property is to be taken at a fair valuation—that is, at its fair market price. This price is, as it necessarily must be, unless the parties agree upon it, to be ascertained by judicial methods. It is argued that the language

employed shows that it was the intention of the parties to appoint their own appraisers. It shows the reverse. Appraisement by the court or its officers is as consistent with the words and spirit of the contract as any other. To interpolate, "by appraisers to be appointed by the parties," would be to vary the terms of the contract and to vary them, not for the purpose of giving effect to the contract, but of defeating it.

No question is raised, either in the briefs or in the answer, as to the definiteness of the description contained in the lease of 1893. The eastern boundary of the land is not given, but it is described as being "the property or grounds *now occupied* by the buildings of the said party of the second part and *used* for manufacture of fertilizer, glue," &c. The evidence shows that the property so occupied and used is that which complainant held possession of under a prior lease of May 8th, 1889, which describes the lands with reasonable certainty. *Brooks* v. *Wentz, 61 N. J. Eq. (16 Dick.) 474.* The bill gives a particular description of the land and the answer admits what the evidence shows to have been the fact, that the complainant was in possession of the land so described on March 8th, 1893.

The complainant is entitled to a reference to a master to have its fair value ascertained.