STEDMAN ET UX. *v.* HILL
[No. 160, October Term, 1949.]

570

*Decided June 9, 1950.*

The cause was argued before MARBURY, C. J., and COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Wesley E. Thawley* and *W. Hyland VanSant,* with whom were *Thawley & Smith* on the brief, for the appellants.

*W. Brewster Dean* for the appellee.

GRASON, J., delivered the opinion of the Court.

Harry Stedman and Emma Stedman, his wife, prior to November 9, 1944, owned in fee simple by the entireties, a property in Ridgely, Caroline County, Maryland, where they for some fifteen or sixteen years conducted a grocery, provisions and meat store. They wanted to sell it. William G. Hill decided to go in business, and the Stedmans and Hill met and discussed the matter of Hill taking over the store. The result was that on November 9, 1944, a "Contract and Agreement of Sale" was reduced to writing and signed by them. The provisions of this contract, which are of interest here, are: 1. That Hill was to rent the store property for $30.00 a month for a period of one year, with the right of continuing possession at the same rent for the period of two more years; 2. that Hill was to buy the stock in trade in the store at an appraised value, and was to pay $1,000.00

in cash at the time the store and provisions were delivered to him, and the balance of the price therefor was to be paid within one year from the date of a lease to be executed; 3. that the fixtures in the store, used in connection with its operation, were to be leased at a rental of $20.00 a month, with an option to purchase the same for $3,500.00 at the end of a two year period, rent paid in the meantime to be deducted from the $3,500.00; 4. that Hill was to have an option to purchase the store property at a price of $3,000.00 at any time during the three year period. There were other provisions in the contract and agreement, which we need not recite.

On the 30th day of November, 1944, there was executed by the parties a "Lease and Agreement of Rental" which was to date from November 27, 1944. This Lease and Agreement of Rental contains the same provisions as the Contract and Agreement of Sale dated November 9, 1944, and the purchase price of the stock in trade was determined to be $2,700.00. This instrument provides for a lease for one year, and "that this lease shall be renewable from year to year for a period of three years for the real estate herein described, unless the Lessee shall notify the Lessors at least thirty (30) days prior to the end of any year that he does not desire to continue said Lease, and said lease shall expire at noon on November 27, 1947, without any notice from either party and shall not be renewable beyond that time, without the consent in writing of all the parties hereto. * * * that this lease, as it pertains to the fixtures and personal property, shall be renewable on November 27th, 1945, for a period of one year unless the Lessee shall give notice in writing to the Lessors that he does not desire to continue to renew said Lease for another year; but, in any event, said lease of the fixtures and personal property shall end on November 27, 1946 without notice to either party and shall not be renewed after that time unless by an agreement in writing signed by all the parties hereto." This instrument will be referred to herein as the first lease.

Hill paid $1,000.00 in cash and he and his wife gave a note to the Stedmans for $1,700.00, payable in one year, with interest. Hill entered possession of the store property on November 27, 1944.

Under this Lease and Agreement of Rental Hill conducted this business and performed all of his obligations under the first lease until September 9, 1945, when he met with an automobile accident in which he was severely injured, and was away from the store until about the first of December, 1945. From the date of the accident until that time the store was operated by the Stedmans.

When Hill came back to the store, in the early part of December, 1945, what will hereafter be called the second lease was executed, on the 6th day of December, 1945. Under its terms the Stedmans leased to Hill and his wife the store property for a period of two years, beginning November 27, 1945, and ending November 27, 1947, for $35.00 per month; "that this lease shall on November 27, 1947, become automatically renewed in its entirety at the same rental for the term of one year and from year to year thereafter unless either party hereto shall notify the other party by notice in writing at least six months prior to November 27, 1947, of his or their intention to terminate same". It provides that the lessee shall pay all sewer and water rents incurred by reason of their occupancy of said premises, and to be responsible for the payment of charges for electric current and telephone services used by them in the conduct of the business. It provides for the removal of all fixtures or other property placed in the storeroom. This second lease is silent as to the option to buy the store property, contained in the first lease.

In May, 1947, Hill notified Stedman that he desired to exercise his optional right to purchase the store building and land on which the store building was located, and Stedman told him that he had no option to purchase the store property. The bill in this case was then filed by Hill against the Stedmans for specific performance for the sale of the property, relying upon the option

contained in the first lease. Answer was filed by the Stedmans, testimony was taken in open court, and the chancellor decreed specific performance of the sale of the property, from which decree the appeal in this case was taken.

In a case where property has been leased for a given term, in order to surrender that term before it has expired, by a new lease providing for the same term as the old one, the Statute of Frauds requires a surrender in writing, or by act and operation of law. Alexander's British Statutes, Coe's Ed., Vol. 2.

In *Lyon v. Reed*, 13 M. & W. 285, English Reprint 153, which was decided in 1844, Baron Parke said:

"The ordinary course pursued on the renewal of a lease is for the lessee to deliver up the old lease on receiving the new one, and the new lease usually states that it is made in consideration of the surrender of the old one. No surrender by deed is necessary, where, as is commonly the case, the former lessee takes the new lease, and all which is ordinarily done to warrant the statement of the surrender of the old lease as part of the consideration for granting the new one, is, that the old lease itself, the parchment on which it is engrossed, is delivered up. Such surrender affords strong evidence that the new lease has been accepted by the old tenant, and such acceptance undoubtedly operates as a surrender by operation of law, and so both parties get all which they required. * * *

"In order to ascertain how far those two cases can be relied on as authorities, we must consider what is meant by a surrender by operation of law. This term is applied to cases where the owner of a particular estate has been a party to some act, the validity of which he is by law afterwards estopped from disputing, and which would not be valid if his particular estate had continued to exist. There the law treats the doing of such act as amounting to a surrender. Thus, if lessee for years accept a new lease for his lessor, he is estopped from saying that his lessor had not power to make the new

lease; and, as the lessor could not do this until the prior lease had been surrendered, the law says that the acceptance of such new lease is of itself a surrender of the former. * * * In such case it will be observed there can be no question of intention. The surrender is not the result of intention. It takes place independently, and even in spite of intention."

Thus it was held that the giving of a new lease extinguished the old lease, and the question of whether the parties intended this result is immaterial.

This court has recently decided that where a lease contained an option to purchase the property leased, the same constituted an indivisible contract as to both the term and conditions of the lease and the option. It has been specifically pointed out that we do not follow the English rule that an option to purchase, contained in a lease, is a collateral matter, separate and distinct from the lease. We have also stated that whether an option to purchase, contained in a lease, can be exercised by a tenant during an additional term depends upon the intention of the parties, to be gathered from the instrument itself. *Gostin v. Needle,* 185 Md. 634, 45 A. 2d 772, 163 A. L. R. 1013; *Schaeffer v. Bilger,* 186 Md. 1, 45 A. 2d 775, 163 A. L. R. 706; *Gressitt v. Anderson,* 187 Md. 586, 51 A. 2d 159.

The case chiefly relied on by the appellants is *Enyeart v. Davis,* 17 Neb. 228, 22 N. W. 449, 452. The lease dealt with in that case contained an option to sell the farm leased to the lessee by the lessor. Subsequently, during the term, a new lease was executed between the parties, in which it was provided that the lessee would give quiet possession of the premises to the lessor at the end of the term therein provided, and it was silent as to the option contained in the old lease. The lessee contended that the second lease was obtained by fraud. The court stated: "The law is thus laid down by a standard authority: 'Where a lessee for years accepts a new lease from the reversioner, he is estopped from saying that his lessor had no power to make such a lease; and, as

the lessor cannot grant a new lease until the prior one has been surrendered, the acceptance of the new lease necessarily implies a surrender of the former one. Such surrender is an act of law, and takes place independently of the intention of the parties.' "

This decision follows the English rule laid down in *Lyon v. Reed, supra,* in which it was held that a second lease for the same term operates to render the first lease void and the question of the intention of the lessee is immaterial. Some cases have followed this rule, but we think that the weight of authority and the best rule is to the contrary. Of course, if a second lease, in material matters, is so inconsistent with the first lease, that the first lease would be smothered out by the second, there would be no question that the first lease would become inoperative and void by the act of the parties in the execution of the second lease. But if the second lease varies from the first lease in slight and trivial particulars, and is silent on a vital matter which is contained in the first lease, it would seem that the just rule should be whether by a comparison of the first lease with the second lease, and the facts and circumstances surrounding the execution of the first and second leases, it is reasonable to suppose that the parties united in their intentions that a vital matter contained in the first lease was intended to be null and void. And in considering the matter it is important to determine whether the second lease can operate with the first lease, and be construed as only a modification of the first lease. Under the Nebraska case, which followed the English case, nothing like this could be done. Under those cases, the mere execution of the second lease renders the first lease null and void, no matter what violence such a conclusion may have upon the intention of the parties.

In *Donkersley v. Levy,* 38 Mich. 54, page 59, it is stated: "It is true that Levy and Asch (tenants) did not remove from the store when these events occurred; but it is also true that the company gave and Donkersley accepted with the assent of Levy and Asch a lease *in-*

*consistent* with that which had been given to the latter, and that Donkersley at the same time made to them and they accepted his verbal lease for the time being and which was also *inconsistent* with the continuance in force of the first lease." Italics supplied.

In *Van Rensselaer's Heirs v. Penniman,* 6 Wendell 569, 581, it is said: "When the second lease was executed, the lessee had a good title by the first lease to all which it purported to convey. He had, besides, the personal covenant of the lessor for the payment of the improvements. On the supposition that a surrender was intended, the lessee must have intended to abandon all claim for his improvements, and to give up a good title for three lives, on receiving a lease for one of those lives. * * * The authorities say that the surrender in cases of second leases is presumed from the intention of the parties. In this case, every circumstance, except the fact of receiving the second lease, altogether rebuts the idea of an intention to surrender the right to compensation for improvements."

In *Coe v. Hobby et al.,* 72 N. Y. 141, at pages 147 and 148, 28 Am. Rep. 120, it is said: "Assuming that the contract and agreement of the parties was that from the time of making it, the rent should be reduced to $4,000 dollars per annum, and that the lessor should have the right to terminate the lease upon notice, and that such agreement was valid, it was but a modification of the terms of the original demise, leaving all the other covenants and conditions intact. There was no agreement *inconsistent* with the existing lease, or any assumption of dominion over the estate by the lessor *inconsistent* with the term vested in the lessee. Each, in dealing with the other, dealt with matters over which they had control under and by virtue of the lease.

"The lessor assumed to release his right to a portion of the rent, which he might lawfully do, and the lessee undertook to yield conditionally, and upon notice in the future, a portion of his term. It cannot be assumed or implied from such agreement that a *surrender* of the

old lease was *contemplated* by either party. The lease continued in full force, except as *modified* by the agreement. It is preposterous to say that a reduction of the rent is a surrender of an existing lease, and the granting of a new one. The new agreement in such case is virtually incorporated into, and made a part of the antecedent agreement, and the two would constitute the lease for the unexpired term. (*Evans v. Thompson,* 5 East, 193; *Hasbrouck v. Tappen,* 15 J. R., 200.) There was no surrender of the lease by operation of law, for the reason that there was no dealing with the estate by the lessor *incompatible* with the lease, and no new letting of the premises by parol or otherwise." Italics supplied.

In *Flagg v. Dow,* 99 Mass. 18, the court approved *Van Rensselaer's Heirs v. Penniman, supra.*

In *Copper v. Fretnoransky,* Com. Pl., 16 N. Y. S. 866, 867, the court said: "Here, beyond doubt, was a termination of the demise, and a creation of a new term upon totally different conditions. 'A surrender, by operation of law, may be derived from the acts of the parties, or be effected by words manifesting the intention of the lessee to yield up the estate, or by acts of the parties which imply that both agree to consider the surrender as made.' *Beall v. White,* 94 U. S. 382, [24 L. Ed. 173]. 'A surrender is implied and effected by operation of law when another estate is created by the reversioner, with the assent of the tenant, *incompatible* with the existing estate or term, as by the taking of a new lease by the lessee.' *Coe v. Hobby,* 72 N. Y. 141, 145, 28 Am. Rep. 120; *Abell v. Williams,* 3 Daly, 17; 1 Schouler, Pers. Prop. 38; 6 Lawson, Rights, Rem. & Pr. P. 4669; 12 Amer. & Eng. Enc. Law, p. 758i; McAdam, Landl. & Ten. p. 467." Italics supplied.

In *Hurtt v. Woodland,* 24 Md. 393, Woodland, the landlord, executed a lease of his farm to Peacock for a term of four years, commencing on the first day of January, 1857. During the first year of the term Woodland planted twenty-five acres thereof in peach trees. On January 31, 1859, the following agreement was executed:

"This agreement, made this day between J. F. Woodland and Joseph Peacock, both of Kent County, Md., witnesseth that the said Woodland for and in consideration of certain conditions hereinafter mentioned, agrees to lease to the said Peacock, the peach orchard field at Marsh Point, for the term of one year; the said Peacock agrees to furnish two tons of Peruvian guano for said field, and to till it in corn, the said corn to be planted and worked in farmer-like manner, and the fodder saved in like manner for said Woodland, who agrees for said service of Peacock, to allow him off of said field of corn to take eight hundred bushels."

Peacock assigned his interest in the lease and crops to Joseph W. Hurtt. The heirs of Woodland claimed the peaches gathered from the orchard, and sued Hurtt for their value. It was claimed in that case that the agreement of January 31st, 1859, operated as a surrender of the lease so far as the peach orchard was concerned, and the fruit became their right and property. This court said:

"It is not pretended that the lease, as to this field, had been surrendered in any way at any time previous to the agreement. The agreement itself, and what took place under it, are relied upon by the appellees as a surrender of the lease by operation of law; not by way of a new lease; for if so construed, then the lessee would be clearly entitled to the peach crop, inasmuch as it was not reserved by the instrument to the landlord.

"Can it then be construed or regarded as a contract, *so inconsistent with the terms of the lease and the relation of landlord and tenant under it, as to operate a surrender of the lease as to this field, or to change the rights of the tenant, under the lease, to the peach crop?*

"We do not see that such is the character or legal effect of the agreement. Looking at it and its attendant circumstances as given in proof, we discover nothing to change the relation of landlord and tenant that existed between the parties under the lease. * * * Whatever opinion the landlord may have secretly entertained at

the time, and afterwards openly expressed respecting his right to them, it is very clear from the tenant's declarations in reference to the subject, that he did not design to relinquish by the agreement his rights as tenant to the fruit. So far as his consent was necessary to the disturbance of the relation of landlord and tenant, it had not been given. The terms were only varied as to a portion of the leased premises, but the relation itself, and all rights not affected by the agreement, remained as before. If the agreement had not been entered into, the peaches were the tenant's and there is nothing in the agreement itself, or in its mode of execution, which could have the effect of depriving him of this right. * * *

"We therefore are of opinion that the relation of landlord and tenant, as to this field, continued notwithstanding the agreement, and that the tenant's right to the peaches was not impaired by it." Italics supplied.

In *Lester Agricultural Chemical Works v. Selby*, 68 N. J. Eq. 271, 59 A. 247, in which a lease of land gave the lessee an option to purchase, but before the expiration thereof the lessee accepted a new lease which described the premises more specifically, contained a restriction on the use, not contained in the first lease, and omitted the option, and in which the first lease was not surrendered, and both leases contained a covenant to surrender the premises at the expiration of the term, it was said, 59 A. at page 250: "The omission of the clause giving the option to purchase proves nothing. It does not concern the term one way or the other, and the restriction upon the user would be equally effective whether the term created by the first lease did or did not subsist. If the leases be regarded merely as contracts, and not as instruments conferring estates, the result is the same. The rule is thus stated in Clark on Contracts, § 229: 'Where it is claimed that a contract has been discharged by a new contract, or by the introduction of new terms, the intention to discharge must distinctly appear to give rise to such an implication from the *inconsistency* of the new terms with the old ones.' The argument was

that the covenant to surrender up the premises at the expiration of the term, contained in the second lease, was *inconsistent* with the option to purchase, found in the first lease. But precisely the same covenant is found in both leases, and it can, therefore, be no more inconsistent with the terms of the one than of the other. It is obvious that in both the covenant has reference merely to the term; that it is quite independent of the option to purchase." Italics supplied.

From these authorities we deduce the following: 1. That where a first lease for a given term is followed by a second lease for the same term, or part thereof, between the same parties, for the same property, and the terms, covenants and conditions of the second lease are so inconsistent with the first lease that the two cannot exist together, the first lease is rendered null and void by the second lease. 2. That where the first lease is not so inconsistent and incompatible with the second lease entered into between the same parties for the same term, or part thereof, for the same property, that the two cannot operate together, then the first lease is not rendered null and void, but still subsists, and the second lease is but a modification of the first lease; and in such a case the question of intention is material and relevant, and therefore admissible. 3. We reject the doctrine of *Lyon v. Reed, supra,* that a second lease destroys the first lease under all circumstances, and that all evidence that the second lease was not intended to destroy the first lease is immaterial, and we cannot follow the case.

It follows that we cannot adopt the case of *Enyeart v. Davis, supra,* which is based upon the doctrine announced in *Lyon v. Reed, supra.*

Under the first lease the appellee was secure in his tenancy for a period of three years. During the first year he was to pay for the stock the sum of $2,700.00; any time during the second year he could exercise the option to purchase the store fixtures for the sum of $3,500.00; and he had an option to purchase the store property at any time during the term for $3,000.00. It

is perfectly clear that the scheme of the lease was the rental for three years, the payment of the stock in trade the first year, to exercise his option to purchase the store fixtures in two years, and during the third year to exercise his option to buy the property.

When Hill returned to the store after his accident, in December, 1945, Stedman had numerous complaints to make concerning the way the store business had been operated by Hill from the time he took possession until his accident. Hill testified that Stedman complained of the store being dirty; that the business was not as good as it was at the time he operated it; that the fixtures were out of repair; that the refrigerator was so out of repair that the meat spoiled; he complained of Hill's drinking and gambling, and of his domestic discord, that the bank dishonored his checks, and that he could not go on in this manner, and a different arrangement would have to be made. We are not impressed with these complaints. His testimony regarding the same is general and vague, and when called for specific instances his answers involved trivialities. The refrigerator Stedman fixed by tightening a hinge on its door; the cost of repairs to fixtures used in the store did not amount to $5.00; he met some checks at the bank, but the amount thereof is not specifically stated; the neglected and dirty condition of the store was testified to by himself, his wife, and a woman who was a friend of his wife, all interested witnesses; on the contrary, disinterested witnesses testified that the store was kept in a clean condition by Hill. From the time that Hill took possession of the store until September 9th, when he met with his accident, although Stedman was in the store many times, he made no complaint to Hill, and during that time there is not a scintilla of evidence to show that Hill did not perform fully the terms and conditions of the first lease.

It is impossible to read this testimony without the feeling that these complaints were without foundation and were made in the hope that he could rid himself of the option to purchase the store contained in the first

lease. He stresses the sacrifice he made in looking after the store during Hill's absence, but he and his wife, for a period of three months, were paid, at Hill's expense, the sum of $800.00 for their services, and he hired other people at Hill's expense to help him to conduct the store.

James Heavalow testified: "He (Stedman) wanted me to go to work there and help him out and if I would go to work at the store, he didn't think that Bill would ever come back. He didn't think he would live and, if he did live, why he didn't think he would be able to take the store over, and that if he didn't, why I would get the store because he wanted me to have it." He also testified: "He (Stedman) said he had a man offer him $6,000.00 for the store in the town of Ridgely, but he didn't mention any money."

It was shown by a real estate expert that this store property, at the time of the trial, was worth $6,000.00. It is perfectly apparent from the testimony that Stedman did not want to carry out his option to sell this store to Hill for $3,000.00. He and Hill went to Mr. VanSant, who was Mr. Stedman's attorney, and the second lease was drawn and subsequently executed. The same covenants in the first lease are contained in the second lease, except: (1) that the rent was to be $35.00 a month instead of $30.00 per month; (2) "that this lease shall on November 27, 1947, become automatically renewed in its entirety at the same rental for the term of one year and from year to year thereafter unless either party hereto shall notify the other party by notice in writing at least six months prior to November 27, 1947, of his or their intention to terminate same"; (3) "that the Lessees shall pay to the Commissioners of Ridgely all sewer and water rents incurred by reason of their occupancy of said premises and to be responsible for the payment of charges for electric current and telephone services used by them in the conduct of said business."

Thereafter Hill paid Stedman in full for the stock, in accordance with the terms of the first lease; he exercised his right under the option to buy the store fixtures, pay-

ing Stedman $500.00 down and giving to Stedman a chattel mortgage on the same for the balance of the purchase price (which was subsequently paid). In May, 1947, Hill told Stedman that he was ready to exercise his option to purchase the store property. The witness Cherry, who was working for Hill at the time, testified that when Stedman came into the store Hill told him: " 'Mr. Stedman, I am ready to exercise my option on the building now'. Mr. Stedman said, 'Well, you haven't got any option on the building'. And Bill said, 'That's not what you told me over in VanSant's office', and that's when he walked off and went over on the grocery side, and then when he went over there, he said, 'Well, I couldn't sell it to you anyhow for less than $6,000.00 because Momma wouldn't sign it'." Hill testified to the same effect but Stedman denied their testimony.

Stedman testified that before going to VanSant's office for the purpose of drawing up the second lease, he told Hill that he could not sell him the store property, but would simply give him a lease. He was asked:

"Why didn't you have your verbal agreement reduced to writing so that there would be no dispute? A. Why we both understood it and we came over and talked it right over in Mr. VanSant's office too.

"Q. As you both understood it, you both understood about the fact that he was going to pay more rent? A. Yes, sir.

"Q. If you had one thing reduced to writing, why didn't you have the other? A. We didn't think it was necessary.

"Q. That was the most important thing about it, wasn't it? A. I didn't give it a thought. I didn't keep it for that purpose. * * *

"Q. Now, according to your contention, you wanted, and thought, the option which he had in the former lease, you wanted that revoked, didn't you? A. No, I didn't want it revoked particularly. It was just simply we had to make a new agreement all the way around.

"Q. Why didn't you put that; wasn't that a very material thing to you? A. I didn't think it was."

He further testified he "didn't think anything about particularly about not having it (the option) in the contract only as we had agreed and talked it over between ourselves. * * *

"Q. Did you at any time prior to the preparation of the second lease inform Mr. VanSant about this option being no longer operative? A. No.

"Q. You thought it was not worth while to tell Mr. VanSant? A. We both related it to him in the office.

"Q. About the option being not operative? A. Yes, sir.

"Q. Then why wasn't it put in the paper, the lease? A. I don't know. We embodied in the paper; the paper was altogether different. We embodied in that paper, Your Honor, that we thought this would take care of it, that before there was nothing in the other contract saying that we would give each other six month's notice."

He further testified: "We didn't discuss it with Mr. VanSant. We just told him what we wanted in this new contract." It was testified by Stedman, his wife, and a lady friend of Mrs. Stedman, that when Stedman and Hill returned to the store from VanSant's office Hill said: "'Well, we got along all right. Everything's all right. I didn't get the store property but I am satisfied the way it is.'" Hill denied this.

One cannot read the testimony without being impressed that the evidence of Mr. and Mrs. Stedman, their son Gene, and Mrs. Kirsch is couched in language almost, if not identical, including details. They said that there had been frequent talks about the matter, and the similarity of their evidence, in the light of the fact that they are interested parties, casts a suspicion upon their testimony.

Hill testified that when VanSant read over the second lease in his office he noted that it omitted his option to buy the store property. He called Stedman's attention to it, and Stedman said that that was taken care of in the first lease, and that Mr. VanSant said, "That right",

and under those circumstances he signed the second lease. He testified that he did not mind paying $5.00 a month more rent, nor the water rent.

Mr. VanSant drew both of the leases involved in this case. He was asked: "Do you recall hearing any conversation between Mr. Stedman and Mr. Hill in regard to an option to purchase the real estate? A. That there were to be no options." He said: "There was some conversation as to options and after these papers were drawn up they were taken back and gone over. Each one, I gave each one of them an original or a copy. * * * I read it to them. Q. After you read it to them was there any comment between them as to this option? A. As I recollect it there wasn't any comment at that time. There had been comment before as to the option, some time during this conversation in my office, there was a comment in there by Mr. Hill that he would like very much to have the option to purchase this property, but Mr. Stedman wouldn't give it to him. If there was any other conversation took place it wasn't in my presence." Mr. VanSant was unable to explain why he didn't embody in the second lease that the option to purchase this property, contained in the first lease, was cancelled, although his notes show "no options". He did not advise his client to call upon Hill to surrender the first lease.

Under the circumstances in this case, the failure to clearly set out in the second lease that the options contained in the first lease are cancelled, is a matter of considerable importance. To embody in the second lease specifically trivial matters, and not to embody matters of such importance as the options, involves the second lease in this regard in considerable doubt, and gives rise to an inference that at the time of the execution of the second lease the options contained in the first lease were not destroyed, and strongly corroborates Hill's testimony. It is against all human instinct that Hill should agree to the cancellation of his options, when he was under no obligation in law to do so.

In *Lester Agricultural Chemical Works v. Selby, supra,* it is stated: "The first lease was not, in point of fact, given up, and manual delivery is regarded as material on the point of surrender." [68 N. J. Eq. 271, 59 A. 250.]

We conclude, after a careful comparison, that the second lease is not so inconsistent and incompatible with the first lease as to render the first lease null and void. After careful consideration of all the evidence, we think that the second lease was a modification of the first lease, with respect to matters that were not important. This being so, the fact that the second lease omits the option to buy the store property does not destroy that option, because the first lease was not destroyed, inasmuch as the second lease was a mere modification of the first lease. The decree appealed from will be affirmed.

*Decree affirmed, with costs.*